**In re ALLEN CARPET SHOPS, INC.,
d/b/a Emerson Rug
Company, Debtor.**

**PENINSULA NATIONAL BANK,
Plaintiff,**

v.

**ALLEN CARPET SHOPS, INC., d/b/a
Emerson Rug Company, Defendant.**

**Bankruptcy No. 881–80568–18.
Adversary No. 881–0277–18.**

United States Bankruptcy Court,
E.D. New York.

Feb. 2, 1983.

Otterbourg, Steindler, Houston & Rosen, P.C., New York City, for Creditors' Committee.

Zalkin, Rodin & Goodman, New York City, for plaintiff.

Levin & Weintraub, New York City, for defendant.

## DECISION

C. ALBERT PARENTE, Bankruptcy Judge.

The creditors' committee has moved for reargument and reconsideration of this court's decision of October 12, 1982, granting summary judgment in favor of plaintiff in the above-captioned adversary proceeding.

FACTUAL CONTEXT

On February 19, 1981, Allen Carpet Shops, Inc. filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. Pursuant to 11 U.S.C. §§ 1107 and 1108, the debtor has continued in the management and possession of its property.

Prior to the filing of its petition, the debtor maintained a certain payroll checking account (No. 02–02–106–0) at Peninsula National Bank (hereinafter "PNB"). On January 22, 1981, the debtor deposited in the payroll account a certain check (No. 245) in the amount of $24,000 drawn on European American Bank (hereinafter "EAB"). The check was erroneously micro-encoded by PNB to read as $240,000 rather than $24,000, and the payroll account balance was thus overstated by $216,000.

On February 17, 1981, the debtor deposited in the PNB payroll account a certain check (No. 269) in the amount of $56,000 drawn on EAB. PNB provisionally credited this check to the payroll account subject to the right of charge back in the event of dishonor. On February 20, 1981, one day after the filing of the debtor's bankruptcy petition, PNB debited the payroll account in the amount of $56,000 to reflect the dishonor of check number 269 by EAB for insufficient funds.

On February 20, 1981, at the request of the debtor, PNB transferred the debtor's payroll account balance into a debtor-in-possession payroll account, and continued the same account number (02–02–106–0). Immediately prior thereto the account had a stated balance of $259,315.83. However, due to the aforesaid overstatement of check number 245 and dishonor of check number 269, the account actually had an overdraft or negative balance of $12,684.17 at the time the bankruptcy petition was filed.

On February 25, 1981, this court signed an order authorizing the debtor to pay certain pre- and post-petition wages to its employees totalling $19,545.16. Thereafter, PNB honored and paid a series of wage checks totalling $37,892.92 drawn by the debtor on its payroll account one day prior to the filing of its petition and another series of wage checks totalling $19,996.13 drawn by the debtor on its payroll account six days after the filing. On February 26, 1981, PNB discovered the erroneous overstatement of check number 245 and accordingly debited the payroll account in the amount of $216,000.

PNB commenced an adversary proceeding against the debtor in April 1981 to recover as a priority administrative expense the total of the debtor's alleged payroll account overdrafts, to wit: $70,793.37. On September 8, 1981 the parties entered into a stipulation of settlement, by the terms of which it was agreed that PNB would have an allowed claim of $70,573.32, which to the extent of $45,724.59 would be treated as an administrative expense entitled to priority under 11 U.S.C. § 507(a)(1), with the balance of $24,848.63 to be treated as a general unsecured claim. The stipulation was approved and "so ordered" by the court on September 16, 1981. Thereafter, the debtor paid the sum of $25,362.30 to PNB, but defaulted in payment of the balance to be paid in accordance with the settlement stipulation.

On November 16, 1981, PNB moved by order to show cause to enforce compliance with the terms of the stipulation. Thereafter, the creditors' committee, claiming that it was never served with notice of the proposed stipulation, moved to intervene in the adversary proceeding for the purposes of (1) opposing the motion to enforce compliance with the stipulation, and (2) moving the court to vacate the prior order approving the stipulation. By memorandum decision dated May 26, 1982, the court granted the committee's motion to intervene and vacated the order approving the settlement. An order consistent with the memorandum decision was entered on June 28, 1982, and the adversary proceeding was restored to the calendar.

On September 28, 1982, PNB moved for summary judgment in the adversary proceeding based on the affidavits of George T. Kramer, Assistant Vice President of PNB, Leonard Zalkin, an attorney representing PNB, and Joseph Gelb, debtor's accountant. No papers were served or filed in opposition to the motion prior to the hearing on October 12, 1982. At the hearing, the attorney for the committee made a belated attempt to serve and file a memorandum of law in opposition to the motion and a statement of material disputed facts as required by Local

Rule 22. The committee offered no affidavits in support of its position that there existed genuine issues of triable fact.

At the hearing, the court declined to consider the committee's memorandum of law and Local Rule 22 statement since they were not timely served or filed. The court granted PNB's motion for summary judgment to the extent agreed upon at the hearing by the attorneys for the debtor and PNB. On October 25, 1982, the court signed an order consistent therewith, which was duly entered on October 27, 1982. The order *inter alia* granted PNB an allowed claim of $70,573.22, with $45,724.59 to be paid as a first priority expense of administration and the remainder to be treated as a general unsecured claim. On October 26, 1982, the creditors' committee moved for reargument and reconsideration of the court's decision. The court received memoranda of law from PNB and the creditors' committee, and reserved decision on the motion.

The moving papers expound three justifications for granting reargument: (1) Summary judgment should not have been granted as a matter of law; (2) Summary judgment was improperly based on the creditors' committee's failure to submit any affidavits in opposition thereto; and (3) The court abused its discretion in declining to accept the committee's untimely submission of its memorandum of law and statement of disputed facts.

## I. WAS THE GRANTING OF SUMMARY JUDGMENT IMPROPER AS A MATTER OF LAW?

In its complaint, PNB asks for judgment against the debtor in the sum of $70,793.37, to be treated as an administrative expense having priority under 11 U.S.C. § 507(a)(1). This total is comprised of payments made by PNB on three series of wage checks drawn by the debtor on its payroll account: (1) $12,684.17 drawn by the debtor and honored by PNB pre-petition; (2) $37,892.92 drawn by the debtor pre-petition and honored by PNB post-petition; and (3) $19,996.13 drawn by the debtor-in-possession post-petition for services rendered pre-petition and honored by PNB post-petition. In addition to basing its claim for priority on the administrative expense theory, PNB also asserts wage priority status under 11 U.S.C. § 507(a)(3).

At the outset, it is helpful to narrow the dispute. The creditors' committee, recognizing that of the $19,996.13 paid by the bank on checks drawn post-petition, $19,545.16 was paid on wage checks authorized to be paid under this court's order of February 25, 1981. Accordingly, the committee concedes in its memorandum of law in opposition to summary judgment that it "has no objection to the reimbursement to the Bank of $19,545.16 as an administrative expense upon proper proof of payment of the sum claimed." From the unimpeached affidavits submitted in support of summary judgment and from the copies of cancelled checks appearing in Exhibit "2" of the "Second Supplemental Affidavit" filed by PNB, the court finds sufficient proof to reaffirm the summary judgment granted PNB on this portion of its claim.

### A. *Wage Priority Under 11 U.S.C. § 507(a)(3)*

In its motion for summary judgment, PNB asserted *inter alia* that its claims should be accorded wage priority status under the theory that in honoring the wage checks presented by the debtor's employees it became the assignee of their priority wage claims. It is well established in case law that assignees of wage claims are entitled to the wage priority position of their assignors. *Shropshire, Woodliff, & Co. v. Bush,* 204 U.S. 186, 27 S.Ct. 178, 51 L.Ed. 436 (1907); *In re Stultz Bros.,* 226 F. 989 (S.D.N.Y.1915); *In re Missionary Baptist Foundation of America, Inc.,* 12 B.R. 570 (Bkrptcy.N.D.Tex.1981), *aff'd,* 667 F.2d 1244 (5th Cir.1982). However, as the following caveat offered by one recognized authority makes clear, the cashing of paychecks does not necessarily effectuate an assignment or entitle the payor to wage priority status:

> [A wage] assignment, carrying with it the worker's right to priority, is to be distinguished from a similar transaction where

money is advanced to the bankrupt to meet payrolls by one who then claims priority as an assignee by virtue of the advance; this does not amount to an assignment by the employees to the financing party, for the transaction is, in truth, a mere *loan* to the bankrupt.

3A Collier on Bankruptcy 2138–39 (14th ed. 1975) (emphasis added); *accord, In re Florio,* 12 C.B.C. 420 (Bkrtcy.D.R.I.1977).

■ The affidavits submitted by PNB do not show that there was an intentional assignment of the employees' wage claims; rather, they demonstrate that the bank's cashing of wage checks constituted an overdraft or loan to the debtor. Accordingly, in the absence of further information regarding the intent of the parties, this portion of PNB's claim would not appear to qualify for priority treatment under 11 U.S.C. § 507(a)(3), but rather should be treated as a general unsecured claim. Thus, insofar as the committee's objection extends to the granting of wage priority status it appears to have merit. However, inasmuch as the court granted PNB judgment for $45,724.59 as a *first priority expense of administration,* and not as a wage priority, whatever objections the committee has to PNB's wage priority theory have been mooted.

### B. *Administrative Expense Priority Under 11 U.S.C. § 507(a)(1)*

■ The second theory of recovery propounded by PNB is that the various overdrafts by the debtor qualify under § 364 of the Bankruptcy Code as loans entitled to administrative priority under § 507(a)(1) of the Code. Pursuant to § 364(a), a debtor-in-possession may obtain without prior court authorization unsecured credit allowable under § 503(b)(1) as an administrative expense if the debt is incurred in the ordinary course of business. Where, however, a loan is made to a debtor-in-possession without court approval outside the ordinary course of business, the lender will only be given administrative expense priority if the equities in favor of so doing are compelling. *Wolf v. Nazareth Fair Grounds & Farmers Mkt., Inc.,* 280 F.2d 891 (2d Cir.1960); *Todd v. Zoda,* 188 F.2d 84 (2d Cir.1951); *In re Avorn Dress Co.,* 79 F.2d 337 (2d Cir.1935).

■ Since the $12,684.17 drawn by the debtor and paid by PNB prior to the filing of the bankruptcy petition was a transaction consummated entirely pre-petition, no administrative priority can be granted thereon. The clear intent of § 364(a) is to allow the trustee or debtor-in-possession to use the administrative priority of § 507(a)(1) as an inducement to lenders *after the commencement of the case* to open lines of credit to the debtor for purposes of reorganization. *See e.g.,* B. Weintraub & A. Resnick, Bankruptcy Law Manual ¶ 8.11[5] (1980). The $12,684.17 overdraft is in essence a pre-petition loan that should be treated as a general unsecured claim. This would appear to be consistent with both the court's order of October 25, 1982 granting PNB an allowed general unsecured claim totalling $24,848.63, and with the committee's position taken in paragraph 6 of its statement of disputed facts that the overdraft "constitutes a general unsecured claim against the estate."

What remains to be considered is whether as a matter of law PNB was entitled to administrative expense priority for the $37,892.92 owed to it by the debtor on checks drawn one day prior to but cashed after the filing of the petition. The committee initially contends that since the checks were drawn pre-petition they were an expense incurred by the debtor rather than by the debtor-in-possession, and therefore do not qualify for administrative priority. In essence, the committee argues that under § 364(a) it is only *after* the debtor is continued in the management of its property that it may obtain financing allowable as an administrative expense. This portion of the committee's objection ignores the fact that according to the uncontested affidavit of Joseph Gelb, debtor's accountant, PNB was requested by the debtor-in-possession *after* the petition was filed to honor the checks that it had drawn pre-petition. Affidavit of Gelb, September 15, 1982, at 2. Thus, the situation was as if the debtor-in-possession had drawn the checks subsequent to the filing of its petition.

Although the court finds no merit in the committee's contention that the court mis-

applied applicable law in granting summary judgment, there appear to be several questions of material fact that are left unanswered by PNB's affidavits, including the following: First, did the overdraft occur in the ordinary course of the debtor's business pursuant to 11 U.S.C. § 364? Second, did the payment of the wage checks, which were issued for pre-petition services, constitute a preference? Finally, was the bank advised by the debtor that it had the requisite authority to pay pre-petition wages?

It is axiomatic that summary judgment should not be granted unless the moving party demonstrates that there are no genuine issues of material fact to be resolved and that he is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *U.S. v. Diebold*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Moreover, in deciding a motion for summary judgment, the facts are to be viewed most favorably to the party opposing the motion. *Id.*

Rule 56(e) of the Federal Rules of Civil Procedure provides in pertinent part as follows:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading; but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

■ The Supreme Court has held that the above-quoted rule "was not intended to modify the burden of the moving party under Rule 56(c) to show initially the absence of a genuine issue concerning any material fact." *Adickes v. S.H. Kress & Co.*, *supra* 398 U.S. at 159, 90 S.Ct. at 1609. The Advisory Committee note on the 1963 amendment to subsection (e) of Rule 56 (which added the above-quoted language) specifically states that "[w]here the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented." It is only where the moving party successfully discharges its initial burden that the nonmoving party will have had to come forward with sufficient evidentiary matter to raise triable issues of fact. *Adickes v. S.H. Kress & Co.*, *supra* at 160, 90 S.Ct. at 1609. Thus, the creditors' committee's failure to submit evidentiary matter was not in and of itself fatal to its case against summary judgment.

■ Upon review of the pertinent affidavits it appears that PNB has not entirely discharged its burden of demonstrating the absence of triable issues of fact. A rehearing, limited to the $37,892.92 portion of PNB's claim, is warranted. Having so found, there is no cause to address the committee's remaining objections.

Settle order.