**In re GLOVER, INC., Debtor.**

**Bankruptcy No. 80–00711 M R.**

United States Bankruptcy Court,
D. New Mexico.

Oct. 11, 1984.

Robert A. Johnson, Albuquerque, N.M., and Paul A. Cooter, Roswell, N.M., for debtor.

Paul Fish, Albuquerque, N.M., for Albuquerque Nat. Bank.

Bill J. Sholer, Albuquerque, N.M., for First Bank of Billings.

## MEMORANDUM OPINION

STEWART ROSE, Bankruptcy Judge.

This matter comes before the Court on remand from the District Court for further proceedings in which this Court is to reconsider, in light of several cited cases, whether the circumstances warrant treatment of First Bank of Billings, Montana's claim as an administrative expense priority claim.

The basic facts are set forth in the District Court's Memorandum Opinion and Order entered May 24, 1982. Suffice it to say that Glover, Inc., a Roswell, New Mexico meat packer, kept a "remote disbursement account" at the Bank, allowing Glover to "float" checks. By agreement, Glover was required to maintain an account balance of $202,000. When checks made their way to Montana and were presented, normal procedure called for the Bank to request and receive wire transfers of funds from Glover, sufficient to maintain the balance, prior to honoring the checks.

In this case, checks were issued by Glover pre-petition,[1] and presented beginning July 7, 1980, after Glover filed its Chapter 11 Petition.[2] For unknown reasons (the Bank officer involved testified in deposition that he had no memory as to what had transpired) the Bank did not receive a wire transfer, but did not dishonor the checks within its 24-hour rule dead-line (midnight of the second business day after presentment). The result of this failure was that the Bank was forced to honor the checks and to make what amounted to an inadvertent loan to Glover, since the account was overdrawn at the time. The Bank received notice of the bankruptcy July 14, 1980. Glover converted to Chapter 7 March 13, 1981.

Attempting to salvage what it could, the Bank asked that the loan be accorded administrative expense priority. It later amended its request to include funds which were transferred from the Bank at Glover's request on July 1, 1980 to pay insurance premiums.[3] After a hearing, Judge Puccini on July 24, 1981 denied the request. On appeal, the District Court remanded the case to consider if there were unusual cir-

---

1. Dates of issue of the checks vary from March 2, 1979 to July 3, 1980, with the great majority having been issued on June 27, 1980.

2. The filing, July 3, 1980, was precipitated by the freezing of Glover's accounts at Albuquerque National Bank, July 1, 1983. The Albuquerque Bank was Glover's major lending institution.

3. If a wire transfer had been requested, the funds, had they not been frozen that day, could have been transferred. However, the Bank debited the account of the City of Billings rather than Glover, a mistake not noticed until March 1, 1981.

cumstances which might justify a *nunc pro tunc* award; on further appeal, the Tenth Circuit determined that the District Court's order of remand was not appealable.

The cases cited by the District Court[4] are Bankruptcy Act cases in which generally either the creditor advanced the debtor's estate more funds than the court had actually authorized, or the creditor had knowingly advanced funds to a bankrupt estate under circumstances in which the creditor could have believed the court had authorized the borrowing; circumstances under which the courts involved found it equitable to provide *nunc pro tunc* authorization and priority status.

Enactment of the Bankruptcy Code altered the conduct of reorganizations. Formerly, in Chapter XI and XII arrangements, court authorization and court supervision were required if the trustee or debtor-in-possession was to be permitted to operate the business. Now, under 11 U.S.C. § 1108,[5] the debtor automatically remains in business without interruptions. Under 11 U.S.C. § 1107, the debtor-in-possession is given all the rights and powers of the trustee, and unless sufficient cause is shown, there will be no trustee involved in the reorganization, 11 U.S.C. § 1104.

Thus, there is no longer a clearly defined demarcation between the pre-petition operating entity and the post-petition operating entity. There is no hiatus while the reorganizing entity awaits operating authority; it continues its pre-petition business activities with its pre-petition personnel, albeit with the rights, powers and privileges granted by the Code. Hence, the possibility arises that a creditor which has extended credit to a financially troubled entity may, because notice of the bankruptcy has not been received, continue to extend credit to a post-petition entity on the same basis. Without such notice, the creditor may have no knowledge of any business reason to alter its credit policy.[6]

Creditors are often loathe to knowingly extend credit to entities in reorganization. Apart from the onus of bankruptcy, payments may be deferred months or years even if the reorganization is a complete success. If the reorganization fails, and the case is converted to Chapter 7, claims arising post-petition, pre-conversion are treated under 11 U.S.C. 348(d),[7] as pre-petition claims. This type of claim is entitled only to a pro-rata share of the assets distributed, unless it is a valid administrative expense.

Recognizing this reluctance, Congress, in Code § 364 structured an escalating series of inducements which the debtor-in-possession may offer while attempting to obtain credit for use in the reorganization.[8] First, under § 364(a) the debtor may obtain unsecured credit needed in the ordinary course of business, and accord that credit adminis-

---

4. *Local Joint Executive Board, AFL–CIO v. Hotel Circle, Inc.,* 419 F.Supp. 778 (S.D.Cal.1976); *In re Public Leasing Corp.,* 344 F.Supp. 754 (W.D. Okla.1972); *Wolf v. Nazareth Fair Grounds and Farmers Market, Inc.,* 280 F.2d 891 (2nd Cir. 1960); *Todd v. Zoda,* 188 F.2d 84 (2nd Cir.1951); *In re American Cooler Co., Inc.,* 125 F.2d 496 (2nd Cir.1942); *In re J.C. Groendyke Co.,* 131 F.2d 573 (7th Cir.1942).

5. Section 1108: "Unless the court orders otherwise, the trustee may operate the debtor's business".

6. Alert creditors finding themselves in these circumstances may exercise their rights under 11 U.S.C. § 546(c) and U.C.C. § 2–702 to reclaim goods sold on credit, within ten days of the debtor's receipt thereof.

7. Section 348(d): "A claim against the estate or the debtor that arises after the order for relief

but before conversion in a case that is converted under sections 1112 or 1307 of this title, other than a claim specified in section 503(b) of this title, shall be treated for all purposes as if such claim had arisen immediately before the date of the filing of the petition."

8. Under the Act, almost any claim arising during an arrangement was granted administrative expense priority, *Reading Company v. Brown,* 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968). In *Brown* administrative expense priority was given to the holder of a damage claim arising from a fire caused by workmen employed by the Chapter XI trustee. Generally, the rational was that costs incurred by the trustee during the arrangement were expenses incurred while preserving the estate.

trative expense priority, simply by offering the priority.[9] If the creditor is reluctant to advance credit, a super-priority, or liens junior to other encumbrances on property of the estate, may be offered, subject to court approval, under § 364(c). For the most recalcitrant and necessary creditors, the court, under § 346(d) may authorize the obtaining of credit secured by liens senior to or of equal priority to existing liens on property of the estate, as long as the existing lien holders are adequately protected.[10]

■ Thus, under the Code, it is possible that some post-petition creditors, upon conversion to Chapter 7, will enjoy administrative expense priority, and some will not. Mere post-petition incurrence is no longer in itself a guarantee of administrative priority. Applying the Act's automatic administrative expense priority to claims incurred by the Chapter 11 entity prior to conversion to Chapter 7 would render § 348(d) meaningless. The section does not distinguish between the origins of claims, only whether they have administrative expense priority. Therefore, it is unlikely that a damage claim of the type dealt with in *Brown* would be given priority today.

A recent Seventh Circuit decision, *In the Matter of Jartran, Inc.*, 732 F.2d 584 (1984) upheld the Bankruptcy Court's denial of administrative expense priority in circumstances similar to this case. There Jartran, a truck rental firm, placed an order for yellow-pages advertisements with two advertising agencies. No payment from Jartran was required at the time. Before payment was due, Jartran filed a Chapter 11 petition. Because of the nature of the business, the advertisements could not be cancelled, and they duly appeared post-petition. The agencies themselves were liable on the bill, over $1,000,000, and requested

their claims be granted administrative priority in that the advertisements assisted Jartran's reorganization. The Circuit's opinion made clear that the purpose of administrative priority is to give the debtor-in-possession a bargaining chip with which to induce creditors or third parties to extend further credit:

> The policies underlying the provisions of § 503 ... are not hard to discern. If a reorganization is to succeed, creditors asked to extend credit after the petition is filed must be given priority so they will be moved to furnish the necessary credit to enable the bankrupt to function ... Thus, [w]hen third parties are induced to supply goods or services to the debtor-in-possession ... the purposes of [§ 503] plainly require that their claims be afforded priority.

*Id.* at 586 (citations omitted). The Court went on to state:

> To serve the policy of the priority, inducement of the creditor's performance *by the debtor-in-possession* is crucial to a claim for administrative priority in the context of the furnishing of goods or services to the debtor.

*Id.* at 587. The *Jartran* panel found no inducement by the debtor-in-possession and affirmed the denial of the request.

As one bankruptcy court put it:

> The clear intent of § 364(a) is to allow the trustee or debtor-in-possession to use the administrative priority of § 507(a)(1) as an inducement to lenders *after the commencement of the case* to open lines of credit to the debtor for purposes of reorganization.

*In re Allen Carpet Shops, Inc.*, 27 B.R. 354 (Bankr. E.D.N.Y.1983) at 358 (emphasis in original).

---

**9.** Section 364(a) says if the business is operating, "the [debtor-in-possession] may obtain unsecured credit and incur unsecured debt in the ordinary course of business allowable under section 503(b)(1) of this title as an administrative expense." This is not to say that credit obtained in the ordinary course of business is to be accorded administrative expense priority, only that the debtor-in-possession may incur debt with priority status. The bankruptcy court

is not a collection agency, *In re: S.B.A. Factors of Miami, Inc.*, 13 B.R. 99 (Bankr.S.D.Fla.1981). If the creditor does not require that administrative expense priority be granted before extending credit, there is no reason for the court to require priority.

**10.** This is one occasion where the equity cushion alone may have major significance.

The question put to this Court by the District Court is whether there exist any grounds for the Court's use of its equitable powers to grant the Bank administrative priority. The Bankruptcy Court's discretion under the Code is far less than that which it had under the Act. Code § 364 is much more explicit in its terms than the rather vague provisions of Act §§ 116(2), 344 and 446.[11] Code § 364 is meant to govern "... all obtainings of credit and incurring of debt by the estate, "H.R. No. 95–989, 95th Cong. 2nd Sess. 57 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5843. "Any preference for claims not intended by Congress to have priority would dilute the value of the intended priority and thus frustrate the intent of Congress," *Jartran* at 586.

█ Here, the Bank placed no reliance on any representations by Glover; it took no actions based on any expectation of administration priority; it took no actions based on any perception that it was dealing with a debtor-in-possession; the circumstances of Glover's account with it indicate the Bank knew or should have known Glover was in poor financial condition[12]; and its loans to Glover were caused by its own mistakes or omissions. To paraphrase *Jartran*, this court does not perceive any greater hardship to the Bank of Billings than what arises normally from financial failing and attempted reorganization. All creditors to some extent assume the risk of bankruptcy; the prudent creditor minimizes its exposure.

There being no statutory, policy or equitable basis for granting the First Bank of Billings request for administrative priority, the application will be denied.

An appropriate order will follow.

11. As an example, Act § 344 reads: "During the pendency of a proceeding for an arrangement or after the confirmation of the arrangement where the court has retained jurisdiction, the court may upon cause shown authorize the receiver or the debtor in possession, to issue certificates of indebtedness for cash property, or other consideration approved by the court, upon such terms and conditions and with such security and priority in payment over existing obligations as in the particular case may be equitable."

12. The Order Authorizing Use of Cash Collateral, entered July 12, 1980, noted that meat packers were in financial difficulty nationwide, that 39 similar plants had closed within the year, that Glover's management had changed three times within the 18 months preceding the petition, and that the business had operated at a loss for the three preceding years.