In re The A.C. WILLIAMS COMPANY, Ravenna Industries, Inc., Miami Foundry Corporation, Debtors.

RAVENNA INDUSTRIES, INC., M.F. Company, fka Miami Foundry Corporation, Plaintiffs,

v.

OHIO BUREAU OF WORKERS' COMPENSATION, the Industrial Commission of Ohio, Defendants.

Bankruptcy Nos. 581–409 to 581–411. Adv. Nos. 584–0169, 584–0170.

United States Bankruptcy Court, N.D. Ohio.

Aug. 2, 1985.

George Mallo, Sp. Counsel, State of Ohio, Akron, Ohio, Kevin R. Abrams, Law Section, Philip E. Donner, Law Director, Bureau of Workers Compensation, Columbus, Ohio, for defendants.

David Hunter and Marc Merklin, Akron, Ohio, for debtors.

## FINDING AS TO TAX LIABILITY AND INJUNCTIVE RELIEF

H.F. WHITE, Bankruptcy Judge.

This matter is before the court on the verified complaint of A.C. Williams Company ("A.C. Williams"), Ravenna Industries, Inc. ("Ravenna"), and M.F. Company fka Miami Foundry Corporation ("Miami"), debtors, to determine tax liability and for injunctive relief. That branch of the complaint for injunctive relief against defendants herein, the Ohio Bureau of Workers' Compensation ("Bureau") and the Industrial Commission of Ohio ("Commission"), was settled by an order of this court entered November 30, 1984. The defendants were enjoined from conducting administrative proceedings related to workers' compensation coverage of plaintiffs until the final disposition of that branch of the complaint for a determination of tax liability of debtors.

The parties have stipulated to the material facts and to the authenticity of the exhibits which augment the stipulated facts. The parties have fully briefed the issues raised by the complaint. An oral argument was held on July 11, 1985.

The controversy surrounds the payment by debtors of two separate assessments of

the Bureau as premiums to the workers' compensation fund:

1. a merit rating increase in premiums in the sum of $294,347.47 for the period of March 10, 1981 to June 30, 1984 based in part upon Ravenna's pre-petition experience of claims for workers' compensation; and

2. a supplemental billing in the sum of $29,178.27 issued January 5, 1984 for the period of March 10, 1981 to June 30, 1981 pursuant to a rate revision notice sent by the Bureau to Ravenna on or about December 16, 1981.

A brief summary of the history of these Chapter 11 cases will help illuminate the issues raised by the parties. A.C. Williams is an administrative holding company and owns all the outstanding capital stock of Ravenna and Miami. On March 10, 1981, A.C. Williams, Ravenna, and Miami filed petitions for relief under Chapter 11 of Title 11 of the United States Code and continued to run their businesses as debtors in possession. On October 22, 1981 the Bureau filed a proof of claim for unpaid premiums in the Chapter 11 case of Ravenna in the sum of $549,532.40 which was allowed as a priority claim pursuant to section 507(a)(6) by Order of January 5, 1983. On December 8, 1981, the Bureau filed a proof of claim for unpaid premiums in the Chapter 11 case of Miami in the sum of $11,078.77 which claim was allowed as a priority claim pursuant to section 507(a)(6) by the same order. The court confirmed all plans of the debtors on January 5, 1983.

By letter dated December 16, 1981 the Bureau informed Ravenna that its premium rates were revised upward for the payroll period of March 10, 1981 to June 30, 1981 based, in part, upon the pre-petition claims experience of Ravenna. For each successive six-month payroll period the Bureau submitted premium billings which reflected pre-petition experience and which increased Ravenna's premium cost by 95 percent. The premium rate for Miami decreased.

On February 26, 1982 Industrial Advisors ("Advisors"), acting on behalf of the debtors, formally protested the determination to the Actuarial Section of the Bureau. By letter dated April 14, 1982 the Actuarial Section denied the formal protest. By letter dated April 27, 1982 the Advisors requested a hearing before the Adjudicating Committee of the Commission and a hearing was held on February 27, 1984. The Adjudicating Committee denied the protest by letter dated March 13, 1984 and the Advisors appealed that decision. The hearing before the Commission has been stayed by an order of this court entered November 30, 1984 until this court makes its determination of the debtors' tax liability pursuant to section 505(a)(1).

The second disputed assessment involves the Bureau's supplemental billing to Ravenna on January 5, 1984 in the amount of $29,178.27 as the result of a rate revision for the period of March 10, 1981 to June 30, 1981.

▮ The debtors seek an order enjoining the Bureau from using the pre-petition, pre-confirmation workers' compensation claims experience in calculating the experience rating of the debtors and the subsequent premiums owed the Bureau. The debtors argue that such is in violation of the automatic stay provision of section 362, the automatic injunction provision of section 524, the discharge provisions of section 1141 and the anti-discriminatory provisions of section 525. The debtors argue in their briefs that as debtors in possession they are entitled to be treated as new entities and that the use by the Bureau of the pre-petition, pre-confirmation claims experience is prohibited by the Code.

The court finds that this argument is without merit and is instead guided by the decision of *In re Pine Knob Investment*, 20 B.R. 714 (Bankr.E.D.Mich.1982). In that case the Michigan Employment Security Commission ("MESC") requested the bankruptcy court to determine the rates of contribution to the state unemployment system for several debtors in possession pursuant to its power under 11 U.S.C. section 505(a) of the Code. The debtors ob-

jected to the proofs of claim filed by MESC because the post-petition activities of the debtors in possession were used to calculate the contribution rates. The debtors argued that as debtors in possession they were entitled to separate tax treatment, that of a "new employer" with a substantially lower contribution rate. The bankruptcy court first noted that it must give full faith and credit to the state law upon which the tax is based. *Pine Knob*, 20 B.R. at 716 (citing *Arkansas Corp. Comm'n v. Thompson*, 313 U.S. 132, 61 S.Ct. 888, 85 L.Ed. 1244 (1941)). Relevant Michigan law provides that the trustee in bankruptcy is classified as an "employing unit", and that the transfer of the assets of a business to another employing unit transfers that business's rating account. 20 Bankr. at 716. In denying the debtors' request that as debtors in possession they are legal entities distinct from the pre-petition debtor and entitled to separate tax treatment, the *Pine Knob* court concluded:

> From these findings it is concluded that the filing of a petition under Chapter 11, while affording certain rights, does not entitle the estates of the debtors to the contribution rate for new employers established by state law. Nor should the state statute be construed to effect this result. While the filing has created an estate for administrative purposes, the entities have retained possession and control of their assets and are conducting the business in which they are engaged prior to commencement of their cases while they attempt reorganization. As such, they should be treated as successor employers for the purposes of determining what contribution rate is applicable to their activities.

20 B.R. at 716.

This court is in agreement with that conclusion and finds support for its position in *N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 1197, 79 L.Ed.2d 482 (1984):

> Much effort has been expended by the parties on the question of whether the debtor is now properly characterized as an "alter ego" or a "successor employer" of the prebankruptcy debtor, as those terms have been used in our labor decisions. [Citations omitted] We see no profit in an exhaustive effort to identify which, if either, of these terms represents the closest analogy to the debtor-in-possession. Obviously if the latter were a wholly "new entity," it would be unnecessary for the Bankruptcy Code to allow it to reject executory contracts, since it would not be bound by such contracts in the first place. For our purposes, it is sensible to view the debtor-in-possession as the same "entity" which existed before the filing of the bankruptcy petition, but empowered by virtue of the Bankruptcy Code to deal with its contracts and property in a manner it could not have done absent the bankruptcy filing.

104 S.Ct. at 1197. *See also*, I.R.C. sect. 1399 (no separate taxable entity results from commencement of a bankruptcy case involving a corporation).

Upon inquiry by the court on oral argument the attorney for the debtors agreed that the reorganized debtors are not new entities; he acknowledged that the business of the pre-petition and post-petition debtors continued uninterrupted. "There is no hiatus while the reorganizing entity awaits operating authority; it continues its pre-petition business activities with its pre-petition personnel, albeit with the rights, powers and privileges granted by the Code." *In re Glover, Inc.*, 43 B.R. 322, 324 (Bankr.D.N.M.1984).

The debtors argue that if the insurer were a private insurer, then the debtors would have no objection to the insurer using pre-petition experience in arriving at a rate.

The parties do not dispute the process by which the Commission fixes rates; only the use of the debtors' pre-petition claims experience is at issue. They have stipulated to the Commission's authority and method of doing so. Stipulations of Facts 20–28. The power of the Commission to fix rates is

bestowed by section 4123.34 of the Ohio Revised Code:

> The industrial commission, in the exercise of the powers and discretion conferred upon it in section 4123.29 of the Revised Code, shall fix and maintain, for each class of occupation, or industry, the lowest possible rates of premium consistent with the maintenance of a solvent state insurance fund and the creation and maintenance of a reasonable surplus, after the payment of legitimate claims for injury, occupational disease, and death that it may authorize to be paid from the state insurance fund for the benefit of injured, diseased, and the dependents of killed employees. In establishing rates, the commission shall take into account the necessity of ensuring sufficient money is set aside in the premium payment security fund to cover any defaults in premium obligations. The commission shall observe the following requirements in classifying occupations or industries and fixing the rates of premium for the risks of the same:

> . . . .

> (C) The commission may apply that form of rating system which it finds is best calculated to merit rate or individually rate the risk more equitably, predicated upon the basis of its individual industrial accident and occupational disease experience, and may encourage and stimulate accident prevention. The commission shall develop fixed and equitable rules controlling the rating system, which rules shall conserve to each risk the basic principles of workers' compensation insurance.

The premiums fixed are *prospective* and must be sufficiently large to provide a solvent fund for compensation of workers. Ohio Rev.Code Ann. sect. 4123.29 (Page 1980). *See also,* Ohio Admin.Code sect. 4121–7–03(D) (1983). The employer's premium rates are determined by basic rates as affected by the employer's experience modification. Ohio Admin.Code section 4121–7–03 (1983). The experience modifica-

tion percentage of an employer is determined, in part, with reference to the actual past experience of the employer. *Id.* "[T]he purpose of merit rating is to reward a good experience and penalize a bad experience [by allowing a credit for good experience and applying a penalty for bad experience]." J. Young, *Workmen's Compensation Law of Ohio,* sect. 16.17 (2d ed. 1971). The succeeding employer inherits its predecessor's rate and risk coverage:

> (A) The "basic or manual rate" is hereby expressed as the unit of premium per one hundred dollars of payroll for accident and disease coverage.

> (B) Succeeding employers—experience.

> (1) Where one legal entity, not having coverage in the most recent experience period, wholly succeeds another legal entity in the operation of a business, his or its rate shall be based on the predecessor's experience within the most recent experience period.

> . . . .

> (4) Where a legal entity succeeds in the operation of a portion of a business of one or more legal entities having an established coverage or having had experience in the most recent experience period, the successor's rate shall be based on the predecessor's experience within the most recent experience period, pertaining to the portion of the business acquired by the successor.

> . . . .

> (C) Succeeding employers' risk coverage transfer.

> . . . .

> (2) When an active risk coverage is transferred the successor shall assume the predecessor's obligations under the workers' compensation law and shall be credited with any existing premium credits including advance premium security deposit of the predecessor.

Ohio Admin.Code sect. 4121–7–02 (1979) (Exhibit I). Under Ohio law the debtors

are "succeeding employers", and as such, inherit their predecessors' rates and risk coverage.

The debtors place great reliance on section 525 of the Code:

[A] governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title or a bankrupt or a debtor under the Bankruptcy Act, or another person with whom such bankrupt or debtor has been associated, solely because such bankrupt or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, has been insolvent before the commencement of the case under this title, or during the case but before the debtor is granted or denied a discharge, or has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act.

Section 525 codifies the result of *Perez v. Campbell,* 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971) which held that a state would frustrate the "fresh start" guaranteed the debtor under the Code if it were permitted to refuse to renew a driver's license because a tort judgment from an automobile accident had gone unpaid as a result of a discharge in bankruptcy. *See* S.Rep. No. 989, 95th Cong., 2d Sess. 81, *reprinted in* 1978 U.S.Code Cong. & Ad. News 5787, 5867. A review of authorities indicates that section 525 has accordingly been applied to disputes involving licenses, permits, etc., not to rate determinations. *Duffey v. Dollison,* 734 F.2d 265 (6th Cir. 1984); *In re Patterson,* 10 B.R. 860 (Bankr. E.D.Pa.1981), and *In re Young,* 10 B.R. 17 (Bankr.S.D.Cal.1980) (denial of driver's license); *In re Green,* 29 B.R. 682 (Bankr.S. D.Ohio 1983) (real estate license); *In re Alessi,* 12 B.R. 96 (Bankr.N.D.Ill.1981) (horseracing license); and *In re Anderson,* 15 B.R. 399, 5 C.B.C.2d 701 (Bankr.S.D.

Miss.1981) and *In re Maley,* 9 B.R. 832, 4 C.B.C.2d 292 (Bankr.W.D.N.Y.1981) (liquor license). *But see, In re Geffken,* 43 B.R. 697, 701–702 (Bankr.N.D.Ohio 1984). The Sixth Circuit in *Duffey* noted that the legislative history to section 525 indicates that the section was intended to assure the debtor a "fresh start" by preventing governmental discrimination based "solely" on the bankruptcy of the debtor and to strengthen the anti-reaffirmation policy of section 524(b). *Duffey,* 734 F.2d at 271. " '[T]he primary purpose of section 525 of the Bankruptcy Code is to prevent the government either from denying privileges to individuals solely as a reaction to their filing bankruptcy or from conditioning the grant of privileges on the bankrupt's reaffirmation of certain debts.' " *Id.* (quoting *Duffey v. Dollison,* No. C–2–81–1154, slip op. at 8 (S.D.Ohio Aug. 13, 1982)). Legislative history indicates that section 525 is not a prohibition of all factors, such as future financial responsibility or condition, and net capital rules, but it only prohibits the *discriminatory* examination of certain factors, e.g. the fact of bankruptcy or the discharge of a debt in bankruptcy. 734 F.2d at 271.

The Bureau has not levied a higher experience rate on the debtors "solely" on the bankruptcy of the debtor. In fact, the higher rate levied has no relation to the filing of bankruptcy by the debtors, or pre-petition debts, dischargeable or not. The higher rate is related to the debtors' pre-petition experience of safety, or lack of it, in the workplace. The rate determined by the Bureau would be the same whether the employers were "debtors" under Title 11 of the Code, or not. To accord the debtors' argument any merit would be to discriminate in favor of their status as "debtors," and the legislative intent is clearly to prohibit certain types of discrimination by state authorities, not to encourage discrimination in favor of the debtor. No court has stretched the intent of section 525 so far and this court will not be the first to do so. The debtor may avail itself of the bankruptcy laws to achieve a "fresh

start", but it may not shield itself from state authority and use section 525 to achieve a "head start" when a non-debtor employer would pay a higher rate based upon the same experience.

Since the debtors' argument that the Bureau's use of pre-petition claims experience violates the anti-discrimination provisions of section 525 of the Code is without merit, their argument that the relevant state law violated the Supremacy Clause of the Constitution of the United States must also fall. There is no frustration of federal law. Although bankruptcy courts have the power to determine the tax liability of the debtor pursuant to section 505, "there is nothing in the history of bankruptcy or reorganization legislation to support the theory that Congress intended to set the federal courts up as super-assessment tribunals over state taxing agencies." *Arkansas Corp. Commission v. Thompson,* 313 U.S. 132, 145, 61 S.Ct. 888, 892, 85 L.Ed. 1244 (1941). The debtors are free to pursue their remedy in the state administrative agencies and courts. *See* Order of Nov. 30, 1984.

The debtors also argue in support of their complaint that the Bureau's use of pre-petition claims experience is violative of the automatic injunction provisions of sections 362 and 524 of the Code, and of the discharge provisions of section 1141. The foregoing reasoning is applicable here. The premium rate determination is in part based upon the employer's past experience in the workplace. The parties stipulated that there has been no change in the manufacturing process and working conditions of the employees by the debtor or its subsidiaries. The application of the rate creates a fund which is to be used *prospectively.* The rate determination takes into account the safety, or lack of it, in the workplace so that the fund will remain solvent in the face of future claims by injured workers. In making these assessments, the Bureau is not attempting to collect a pre-petition debt. The court refuses to read the Code so broadly as to include the pre-petition claim experience within its definition of "claim".

The final issue before this court is whether the Bureau can collect the supplemental premium of $29,178.27 which was billed to Ravenna one year after the order confirming the plan of reorganization of Ravenna. The Bureau admitted its "oversight" in not filing the claim timely during oral arguments. *See also,* Bureau's Response to Defendant's Reply Brief, June 17, 1985, at pages 5–6. The Bureau was in possession of all information necessary to calculate the supplemental billing on or before December 16, 1981. The additional assessment by supplemental billing on January 5, 1984 for the period of March 10, 1981 to June 30, 1981 was to correct the Bureau's error by which it assessed Ravenna as debtor in possession at the base rate. The parties have stipulated to all relevant dates and facts. Stipulations of Facts 5, 7, 14–19, 40–41, 44(1) and exhibits thereto.

The confirmation of a Chapter 11 plan binds all creditors by its provisions "whether or not the creditor is impaired and whether or not the creditor files a claim. 11 U.S.C. sect. 1141(a)." *In re American Properties, Inc.,* 30 B.R. 239, 246 (Bankr.D. Kan.1983). The confirmation of a Chapter 11 plan has far-reaching effects:

> A confirmed plan is binding on all parties "and must be enforced as written." *Denver & Rio Grande W.R.R. v. Goldman, Sacks & Co.,* 212 F.2d 627, 630 (10th Cir.1954). "[A]ll questions which could have been raised pertaining to such plan are res judicata." 5 Collier on Bankruptcy, para. 1141.01[a] at 1141–5 (15th Ed.1982).

*Id. See also, In re Gurwitch,* 37 B.R. 513, 515 (Bankr.S.D.Fla.1984). The court in *In re Nevada Emergency Services, Inc.,* 39 B.R. 859, 861 (Bankr.D.Nev.1984) notes that:

> [T]he confirmation of the plan discharges the debtor from "any debt that arose before the date of such confirmation," (and certain debts that are deemed to have arisen before the date of the filing of the petition, such as those arising from the rejection of executory con-

tracts) whether or not a proof of claim has been filed or the plan accepted by the creditors. [section] 1141(d).

The Bureau is bound by the amount of its claims as determined by the January 5, 1983 order of this court and by the provisions for payment contained in the plan confirmed by this court. The court is in agreement with the comment expressed in *In re Pennsylvania Iron & Coal Co.*, 40 B.R. 918, 920 (Bankr.S.D.Ohio 1984) regarding the Bureau's delay in filing claims:

[The Bureau must respect the time limitation for asserting claims and] the needs of the Debtor to have knowledge of claims against it within a reasonable period of time so as to permit it to formulate a Plan and file an accurate Disclosure Statement; and to permit the Court and other creditors to intelligently assess the Debtor's overall financial picture in connection with its Plan and Disclosure Statement.

Therefore the court concludes that the Bureau's late assertion of a priority claim for taxes in the amount of $29,178.27 should be denied.