In re SMB HOLDINGS, INC., d/b/a Bride & Boutique, Debtor.

PITTSBURGH NATIONAL BANK, Movant,

v.

SMB HOLDINGS, INC., d/b/a Bride & Boutique, Respondent.

Bankruptcy No. 84–1381.

United States Bankruptcy Court, W.D. Pennsylvania.

Aug. 21, 1987.

Matthew E. Jackson, Jr., Pittsburgh, Pa., for debtor.

Gary P. Hunt, Tucker Arensberg, P.C., Pittsburgh, Pa., for movant.

Sidney R. Finkel, Baskin, Flaherty, Elliott & Mannino, P.C., Pittsburgh, Pa., trustee.

Robert L. Federline, Pittsburgh, Pa., for party-in-interest.

## MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

Presently before the Court is a claim by Pittsburgh National Bank (hereinafter "PNB") for administrative expense priority pursuant to 11 U.S.C. § 503. Specifically, PNB seeks a Finding by this Court that it provided a benefit to the Chapter 11 estate, by honoring a $250,000.00 check drawn on $300,000.00 of provisionally settled funds. When the originally deposited $300,000.00 item and three (3) similar items were all dishonored, PNB exercised its right of charge-back and overdrafted SMB's account in the amount of $214,823.69; it is for this sum that PNB seeks administrative priority, alleging that this "loan" was used to reduce other obligations of the estate.

SMB and an additional party-in-interest/objector challenge PNB's claimed status, asserting that PNB provided no benefit to the estate, as the funds causing the overdraft were not utilized to reduce SMB's obligations; and that PNB was negligent in allowing payment of the $250,-000.00 check prior to final settlement of the item.

Having heard substantial testimony hereon, this Court finds that while PNB's practice of paying on provisional credits is quite liberal, it is not a breach of its duty of care, and thus is not negligent. However, we find no basis upon which to grant PNB's claim of administrative priority and will therefore deny said request.

## FACTS

On June 29, 1984 SMB Holdings, Inc., d/b/a Bride & Boutique (hereinafter "SMB") filed a voluntary petition for reorganization under the Bankruptcy Code. At that time, SMB maintained a corporate checking account with PNB and an additional checking account at the National State Bank of New Jersey (hereinafter "Jersey Bank"). The PNB account was used to pay SMB's day-to-day expenses; The Jersey Bank account was used by Alexander L. Bajusz (hereinafter "Bajusz"), president of SMB, as a personal checking account and as a payroll account. Additionally, SMB borrowed $25,000.00 in working capital from the Jersey Bank in 1983, for which Bajusz executed a security agreement on accounts receivable, inventory and equipment; and a personal guarantee. SMB also borrowed $40,000.00 from PNB, and obtained a $15,000.00 line of credit, for which Bajusz executed guarantees.

Bajusz had personal dealings with Dr. Nelson Harrison, a financial broker, who maintained a money market type of account at First Interstate Bank of California (hereinafter "First Interstate"). The exact nature of their association is unclear; however at some point, Bajusz paid Harrison $30,000.00 to assist in finding financing for Bajusz and SMB.

Before presenting the factual chronology leading up to the substantial overdraft in question, it is necessary to explain the manner in which PNB handled the processing of these out-of-state checks. PNB received the check and noted SMB's account as having uncollected funds, which cannot be withdrawn. That same evening, the check, along with many others, would be delivered to the Federal Reserve Bank in Pittsburgh. Once the Federal Reserve took the checks for collection, it gave a bulk provisional credit to PNB. PNB would redistribute that provisional credit among its customers; once an account was so provisionally credited (usually within 24 hours) PNB permitted the funds to be available for withdrawal. At the same time, the Federal Reserve Bank sent the Harrison check to

the Federal Reserve Bank in Los Angeles; the check would then be transferred to First Interstate for payment. When First Interstate dishonored the check, it is not clear whether notice went directly to PNB or returned through the Federal Reserve system. In either case, the entire process took at least several days to complete, and in this case, more, since the California checks were drawn on a money market fund and not a standard checking account. As a result of this procedure, PNB allowed withdrawals against these provisional funds far before it could possibly have received notice of dishonor.

In the case at bar, Harrison presented Bajusz with a check for $300,000.00, drawn on his account at First Interstate. Bajusz testified, and the checks in large part verified, that the $300,000.00 was for his personal use. The check was made out to SMB because Bajusz had no personal account in Pittsburgh. On May 14, 1985, Bajusz deposited the $300,000.00 California check to his SMB account at PNB. Shortly thereafter, Bajusz drew a check in the amount of $250,000.00 to the order of the Jersey Bank, in order to cover overdrafts in that account, caused by Bajusz in his personal capacity. This SMB check was paid by PNB to Jersey Bank on May 17, 1985, within three (3) days of the original deposit. The originally deposited $300,-000.00 check was subsequently dishonored and PNB charged-back SMB's account on May 23, 1985. However, prior thereto, on May 20, 1985, Bajusz deposited an additional $300,000.00 check from Harrison, drawn on the same California bank, into the PNB account, which PNB provisionally credited on May 21, 1985; therefore, when the first check was dishonored and the first provisional credit charged-back, no overdraft occurred. This second $300,000.00 check was similarly dishonored, and PNB charged-back SMB's account on May 30, 1985. However, on May 28, 1985, Bajusz had deposited a third $300,000.00 check from Harrison, drawn on his California bank, which PNB had provisionally credited on May 29, 1985; therefore, when the second charge-back occurred, SMB's account still showed a positive balance. On May 31,

1985, Bajusz made an additional deposit of $285,000.00, to create a positive balance when Harrison's third check was dishonored. By June 17, 1985, all of the Harrison drafts had been dishonored, PNB had charged-back against SMB's account for all provisional credits, and SMB was left with an overdraft of $214,823.69.

Of the $250,000.00 previously paid to the Jersey Bank, $197,000.00 was used to cure Bajusz's overdrafts, $20,000.00 was used to pay off a loan personally guaranteed by Bajusz, and $18,000.00 was taken back by Bajusz for other personal obligations. The remaining $15,000.00 is not explained; however, Bajusz testified that none of this money was used for payroll or obligations solely belonging to SMB; PNB offered no testimony to discredit or contradict this claim.

## ANALYSIS

Article 4 of the Uniform Commercial Code (hereinafter "U.C.C.") sets forth the practices involving Bank Deposits and Collections, making banking practice and procedure substantially consistent throughout this country. By creating said uniformity, the U.C.C. provides a much faster and more efficient system for commercial conduct. Due to the pace at which commercial transactions proceed, a significant obstacle would be imposed if depositary banks refused withdrawals against *all* provisionally collected funds. Most banks require *some* type of restriction on the use of deposits in order to increase the likelihood that the funds have cleared. However, collecting banks usually learn that final payments have been made only by not learning otherwise within a reasonable time. What is "reasonable" depends on many factors, including the distance the item must travel and the number of banks handling same. *See* 13 Pa.C.S.A. § 4213, Official Comment, Purpose 10; *See Also, Citizens National Bank of Englewood v. Fort Lee Savings and Loan Association*, 89 N.J.Super. 43, 213 A.2d 315 (1965); *Rapp v. Dime Savings Bank of New York, (Rapp II)*, 64 A.D.2d 964, 408 N.Y.S.2d 540, 24 U.C.C. Rep.Serv. 1220 (1978).

A collecting bank, as agent, owes a depositor "ordinary care" in the discharge of its duties, including the obligation to use reasonable diligence in making said collection. *Rapp v. Dime Savings Bank of New York (Rapp I),* 23 U.C.C.Rep.Serv. (N.Y. Sup.Ct.1978).

■ The *Rapp* cases held that a fifteen (15) day holding period for out of state checks was not unreasonably long; however we have not found any decisions where a time period has been found to be unreasonably short. As stated earlier, a turn-around time from Pittsburgh of 2–3 days for a money market check, drawn on a California bank, is at the very least liberal; however, aggressive and zealous action cannot be turned into negligence by hindsight.

Nor does this Court deny that PNB has the right to recover from SMB, since an overdraft resulted from the return of the Harrison checks previously credited to the SMB account. 13 Pa.C.S.A. § 4213(a), (d). However, right of recovery is not necessary synonymous with right to priority.

■ Administrative expense payment is a priority afforded to those who either assist in the preservation and administration of the estate, or who aid the debtor's rehabilitation to the benefit of all creditors. *See In re Armorflite Precision, Inc.,* 43 B.R. 14 (Bankr.D.Me.1984). The goods or services provided must have been given to and actually benefit the debtor-in-possession, and must not be intended to further the self-interest of the particular claimant. *See In re Charter Company,* 52 B.R. 267 (Bankr.N.D.Fla.1985). Therefore, only when potential creditors are *induced* to provide goods and/or services to the debtor-in-possession are the purposes of administrative priority fulfilled. *See Matter of Jartran, Inc.,* 732 F.2d 584 (7th Cir.1984); *In re Mammoth Mart, Inc.,* 536 F.2d 950 (1st Cir.1976).

■ PNB claims that it is entitled to the priority of an administrative expense, asserting that the overdraft allowance is akin to a loan transaction, and that pursuant to § 364 of the Bankruptcy Code, such loan may be treated as an administrative expense.

Section 364(a) provides a debtor-in-possession with the opportunity to obtain unsecured credit, without prior Court approval and, in return, to provide the creditor with administrative expense priority; however, the debt must be incurred in the ordinary course of the debtor-in-possession's business. If the loan is incurred outside the ordinary course of business, the creditor may only receive administrative expense priority if the equities in favor of granting same are compelling. *See In re Cascade Oil Company, Inc.,* 51 B.R. 877 (Bankr.D. Kan.1985); *In re Allen Carpet Shops, Inc.,* 27 B.R. 354 (Bankr.E.D.N.Y.1983). This is so because the primary purpose in a bankruptcy reorganization is equality of distribution among creditors. Only those creditors specifically preferred by the Statute should be treated otherwise. If a priority is granted to a creditor and said claimant is not clearly entitled to same, "it dilutes the value of the priority for those creditors Congress intended to prefer". *In re Cascade Oil Company, Inc., supra* at 881.

In the case at bar, administrative priority has not been proven. Clearly PNB's activities do not fall within the black letter or spiritual confines of § 503 of the Bankruptcy Code. The overdrafting of SMB's bank account at PNB was not shown to be an ordinary business activity. Except for the series of four large deposits and one large withdrawal, all occurring within a 30–day period, there is no indication that SMB's account was *ever* overdrawn. Nor did it appear likely that PNB would have ordinally allowed SMB to create an overdraft, by honoring an SMB draft for which there were insufficient funds available. Overdrafting was not part of the ordinary course of business between SMB and PNB.

In order for the Court to give this "out of the ordinary" expense an administrative priority, PNB must convince us of the compelling nature of the claim. PNB asserts that if overdrafts are not granted administrative priority, banks will be unwilling to allow debtors to draw against provisional funds; and reorganizing debtors will be

forced to either operate on a C.O.D. basis or postpone drawing checks against deposits until they have cleared. We acknowledge the argument as being compelling, but for exactly the opposite reason offered. At the outset we stated that PNB's short term turn-around policy from deposit to withdrawal was at least liberal; when dealing with a financially strained debtor-in-possession, such a policy becomes adventurous. Requiring debtor-in-possession deposits to clear before allowing draws against same is a good policy; perhaps, even a compelling one. If actual clearance is deemed cumbersome, then activities of great moment occurring under unusual circumstances could be monitored by personal contact. Modern technology makes such contact virtually effortless.

PNB might have avoided this frustrating event by seeking prior Court approval pursuant to § 364(b). That is not to say that this Court condones overdrafting of accounts, nor that we would permit same even with advance notice. However, if SMB and PNB sought to increase SMB's credit base by bestowing priority status upon PNB's postpetition extensions of credit, this Court could have heard the request and might have approved same. Then again, this Court might not have approved same for this Debtor.

> However, if the creditor does not require that administrative expense priority be granted *before* extending credit, there is no reason for the Court to require priority.

*In re Glover,* 43 B.R. 322, 325 n. 9 (Bankr. D.N.M.1984) (emphasis added).

An appropriate Order will be issued.