CORO BROKERAGE, INC., A CORPORATION OF THE STATE
OF NEW YORK, AUTHORIZED TO DO BUSINESS IN
THE STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v. MADLYN RICKARD AND JAMES RICKARD, d/b/a
GROVE TRANSPORTATION COMPANY, DEFENDANTS-
RESPONDENTS.

Argued February 16, 1959—Decided March 10, 1959.

Mr. *Thomas E. Weinstock* argued the cause for the appellant (*Messrs. Bendit & Weinstock*, attorneys).

Mr. *Michael H. Hochman* argued the cause for the respondents (*Mr. Abraham Miller*, attorney).

Mr. *David M. Satz, Jr.*, argued the cause for Mr. David D. Furman, Attorney General, *amicus curiae*.

Mr. *Edward Krowen* argued the cause for Insurance Brokers Association of New Jersey, *amicus curiae* (*Mr. Lewis C. Stanley*, on the brief).

Mr. *Harold D. Feuerstein* and *Mr. Marvin A. Sachs* filed a brief for New Jersey Association of Insurance Agents, *amicus curiae*.

The opinion of the court was delivered by

PROCTOR, J.   The plaintiff appealed to the Appellate Division of the Superior Court from a judgment which the Hudson County District Court had entered in favor of the defendants.   We granted certification under *R. R.* 1:10–1(a).

The plaintiff, a New York corporation, is an insurance broker and licensed to do business in New Jersey.   The defendants, James Rickard and Madlyn Rickard, husband and wife, owned and operated a fleet of nine taxicabs in Jersey City.   On April 11, 1957, because of adverse accident experiences, their policy of liability insurance was cancelled, effective April 16, 1957.   Because of statutory requirements the defendants were compelled to obtain a new liability policy prior to the latter date or suspend their operations.   Faced with this situation the defendants communicated with the plaintiff through its president, Ostertag. On April 11 it was agreed in a telephone conversation between Ostertag and the defendant James Rickard that the plaintiff would place the necessary insurance for the defendants with an insurance company on an assigned risk basis within the five-day period, provided that the defendants pay the plaintiff a service charge of 10% of the premium on the policy in addition to any commission that would be paid to the plaintiff by the insurance company.   Later that day the above agreement was reduced to writing and signed by James Rickard.   The plaintiff was successful in placing the insurance through the New Jersey Assigned Risk Bureau in New York City, and within the five-day period a policy was issued to the defendants by the Lincoln Mutual Casualty Insurance Company.   Later the policy was cancelled by Lincoln for the defendants' failure to make payment of the premium.   The defendants did not pay the plaintiff the 10% service charge and the plaintiff brought the present action which is for $837.05, representing 10% of the total premium for the insurance coverage.

At the trial the defendants contended that they had agreed with an agent of the plaintiff that the premium for the

new policy would not exceed a 25% increase over the premium of their cancelled policy, whereas the policy obtained from Lincoln required a 35% increase. The trial judge found as a fact that the plaintiff had not so agreed. This determination is not an issue on this appeal. The trial judge found that "the written agreement to pay the service charge of 10% is in fact the agreement of the parties," but held that the agreement was unenforceable under *N. J. S. A.* 17:29A–15 (*L.* 1944, *c.* 27, § 15).

The principal issue on this appeal is whether the above statutory provision precludes a broker from receiving a service charge from the insured in addition to a commission from the insurer. The trial judge was of the view that "the rating System" and "rate making" process includes the amount that a broker becomes entitled to upon placement of an insurance policy, and that as the rating system approved by the Commissioner of Banking and Insurance does not include a service charge, such a charge cannot be made.

In order to determine the applicability of *N. J. S. A.* 17:29A–15 to the present question it is necessary to consider the role that that section plays in the overall act regulating the making and applying of insurance rates. *L.* 1944, *c.* 27; *N. J. S. A.* 17:29A–1 to 28. The act is a comprehensive statutory scheme designed to regulate and standardize the rates which insurance companies may charge for various forms of insurance coverage. The administrative control necessary to further the statutory objective is vested in the Commissioner of Banking and Insurance. This control is made operative by the Commissioner's authority to determine whether insurance rates are reasonable and adequate, and not unfairly discriminatory. In making such determination the Commissioner is directed to consider

"* * * the factors applied by insurers and rating organizations generally in determining the bases for rates; the financial condition of the insurer; the method of operation of such insurer; the loss experience of the insurer, past and prospective, including where pertinent, the conflagration and catastrophe hazards, if any, both within

and without this State; to all factors reasonably related to the kind of insurance involved; to a reasonable profit for the insurer, and, in the case of participating insurers, to policyholders' dividends. * * *" *N. J. S. A.* 19:29A–11. ·

Rate-making may be engaged in by rating organizations which consist of two or more insurers engaged in the business of rate-making, *N. J. S. A.* 17:29A–2; *N. J. S. A.* 17:29A–1(*f*), or by individual insurers, *N. J. S. A.* 17:29A–4. Rate-making is defined in *N. J. S. A.* 17:29A–1(*c*) as follows:

" 'Rate-making' means the examination and analysis of every factor and influence related to and·bearing upon the hazard and risk made the subject of insurance; the collection and collation of such factors and influences into rating systems; and the application of such rating-systems to individual risks."

The rate-making process culminates in a rating system which must be filed with and approved by the Commissioner. *N. J. S. A.* 17:29A–6, 7. When so approved the rating systems establish the rates to be charged for the various types of insurance coverage. *N. J. S. A.* 17:29A–7. "Rate" is defined in the statute as "the unit charge by which the measure of exposure or the amount of insurance specified in a policy of insurance or covered thereunder is multiplied to determine the premium." *N. J. S. A.* 17:29A–1(*a*).

When the Commissioner has approved a rating system, the insurer, the agent and the broker are then governed by *N. J. S. A.* 17:29A–15, which provides:

*"No insurer or employee thereof, and no broker or agent shall knowingly charge, demand or receive a premium for any policy of insurance except in accordance with the respective rating-systems on file with and approved by the commissioner.* No insurer, or employee thereof, and no broker or agent shall pay, allow, or give, or offer to pay, allow, or give, directly or indirectly, as an inducement to insurance, or after insurance has been effected, any rebate, discount, abatement, credit, or reduction of the premium named in a policy of insurance, or any special favor or advantage in the dividends or other benefits to accrue thereon, or any valuable consideration or inducement whatever, not specified in the policy of insurance, except to the extent that such rebate, discount, abatement, credit, reduction, favor, advantage or consideration may be provided for in

rating-systems filed by or on behalf of such insurer and approved by the commissioner. No insured named in a policy of insurance, nor any employee of such insured, shall knowingly receive or accept, directly or indirectly, any such rebate, discount, abatement, or reduction of premium, or any such special favor or advantage or valuable consideration or inducement. Nothing herein contained shall be construed as prohibiting the payment of commissions or other compensation to regularly appointed and licensed agents and to brokers duly licensed by this State." (Italics added.)

Penalties are provided for the violation of the act. *N. J. S. A.* 17:29*A*–18, 21 to 23.

Is the plaintiff's service charge in the present case encompassed by the term "premium" as used in the first sentence of *N. J. S. A.* 17:29*A*–15? If "premium" includes such a charge, the charge is prohibited. "Premium" is defined in the statute as "the consideration paid or to be paid to an insurer for the issuance and delivery of any binder or policy of insurance." *N. J. S. A.* 17:29*A*–1(*b*).

It is clear that prospective losses based upon prior experience (funds paid out when insured contingencies occur) and expenses are major items considered in setting insurance rates. Any commission or other compensation paid by the insurer to its agent or a broker for the issuance and delivery of a policy is an expense which naturally must be considered. *O'Gorman and Young v. Phoenix Assurance Co.,* 105 *N. J. L.* 642, 645 (*E. & A.* 1929) affirmed 282 *U. S.* 251, 51 *S. Ct.* 130, 75 *L. Ed.* 324 (1931). As a premium is derived from multiplying the amount of coverage by the rate, these expenses are ultimately reflected in the premium. Commissions are payable by the insurer to the agent or broker or both, while premiums are payable by the insured to the insurer as consideration for the insurance. The statute controlling premiums to be charged necessarily controls the amount of the broker's commission because the latter directly influences the amount of the premium. The statute is designed to secure financial soundness of insurance companies on the one hand and to prevent their accumulating excessive profits on the other. If premiums charged on contracts of insurance do not conform

to the approved rating systems, the purpose of the statute would be frustrated. As a consequence each insurer, its agent or a broker is prohibited from charging any amount in variance with the established premium. However, a service charge payable to the broker by his client, the insured, is neither a profit nor an expense of the insurer, and has no effect upon the rate approved by the Commissioner, nor upon the amount of the premium paid by the insured. The service charge in the present case was not represented by the broker to the insured as a part of the premium payment. It was the subject of a separate contract entered into between the broker and his client, the insured, for services to be performed. A payment for such services does not come within the term "premium" as used in *N. J. S. A.* 17:29A–15, and therefore is not prohibited by that section.

The Attorney General as *amicus curiae* contends that even if not expressly prohibited, the absence of any statutory authorization makes it unlawful for a broker to exact a charge from an insured in excess of the rate or premium approved by the Commissioner. In considering this contention it must be borne in mind that we are dealing with a statutory scheme that not only restricts the right to contract but also is penal in nature. As such it should not be construed to prohibit by implication the making of contracts otherwise lawful. *Cf. Moresh v. O'Regan,* 120 *N. J. Eq.* 534 *(Ch.* 1936), reversed on other grounds 122 *N. J. Eq.* 388 *(E. & A.* 1937); *Tannenbaum v. Rosenthal,* 44 *App. Div.* 431, 60 *N. Y. S.* 1092 *(App. Div.* 1899); *Romberg v. Kouther,* 27 *Misc.* 227, 57 *N. Y. S.* 729 *(App. Term* 1899). In the *Tannenbaum* and *Romberg* cases a statute prohibited any representative of an insurance company from charging a fee above that charged or designated in the policy. In each case the court held that the statute was not applicable to contracts between the insured and his own agent or broker for service charges above the amount of the premium, and that such contracts were enforceable by the broker. Implicit in these decisions is the premise

that the enforceability of such contracts is not dependent upon an authorizing statute. See also *I. Tannenbaum Son & Co. v. Rothenberg & Co.,* 201 *App. Div.* 272, 194 *N. Y. S.* 315 (*App. Div.* 1922), affirmed 236 *N. Y.* 520, 142 *N. E.* 267 (*Ct. App.* 1923). *Cf. Arndt v. Miller, Daybill & Co.,* 48 *Misc.* 612, 95 *N. Y. S.* 604 (*App. Term* 1905).

■■ It is generally considered that a broker acts for the insured for the purpose of making the application and procuring an insurance policy. 2 *Couch on Insurance,* § 452 (1929). *N. J. S. A.* 17:22–6.2 defines a broker as an "agent for an insured or prospective insured." In this capacity the broker may render valuable services to his principal, *e. g.,* in determining his insurance needs and in selecting and procuring a policy or policies which will provide the most favorable protection. In our view, a reasonable charge by the broker for such services does not offend public policy. See *I. Tannenbaum Son & Co. v. Rothenberg & Co., supra.* There is no suggestion in the present case that the plaintiff's charge is unreasonable. Nor is any legislative design shown to limit the rights of a broker where the Assigned Risk Plan is utilized. New York by statute expressly recognizes the validity of a contract for a broker's service fee, requiring, however, that it be based upon a written memorandum signed by the party to be charged. 27 *McKinney's Consolidated Laws of New York, Insurance Law,* § 129, *subd.* 1. See *Kahn v. Levenson,* 10 *Misc.* 2d 1058, 170 *N. Y. S.* 2d 144 (*Sup. Ct.* 1957). The Commissioner's statutory authority to license, regulate and discipline brokers, *N. J. S. A.* 17:26–6.1 *et seq.,* provides an effective administrative control over abuses and excesses by the latter in their dealings with the public.

We conclude that neither *N. J. S. A.* 17:29A–15 nor public policy impairs the validity of the contract entered into by the parties for the payment of a separately stated service fee to the broker by the insured.

The judgment of the district court is reversed and the case is remanded with the direction that judgment be entered for the plaintiff for the amount demanded.

*For reversal*—Chief Justice WEINTRAUB, and Justices HEHER, BURLING, JACOBS, FRANCIS and PROCTOR—6.

*For affirmance*—None.