**In re Iris P. CHRISTENSEN, Debtor.**

**Iris P. CHRISTENSEN, Plaintiff,**

**v.**

**STATE of New Jersey, DIVISION OF MOTOR VEHICLES, Defendant.**

**Bankruptcy No. 86–04464.**
**Adv. No. 87–0860.**

United States Bankruptcy Court,
D. New Jersey.

Oct. 17, 1988.

Magargee, Youngblood, Franklin & Corcoran, P.A. by Brian S. Thomas, Pleasantville, N.J., for debtor.

W. Cary Edwards, Atty. Gen. of New Jersey by Louis T. DeLucia, Deputy Atty. Gen., Trenton, N.J., for State of N.J. Div. of Motor Vehicles.

Hudson County Legal Services Corp. by Neil J. Fogarty, Jersey City, N.J., amicus curiae.

## OPINION

ROSEMARY GAMBARDELLA, Bankruptcy Judge.

The matter before the court arises from a complaint filed on September 9, 1987 by Iris P. Christensen, the debtor herein ("debtor"), against the State of New Jersey, Division of Motor Vehicles ("DMV") seeking a determination that a surcharge imposed upon the debtor by the DMV pursuant to N.J.S.A. 17:29A–35(b)(2) for viola-

tion of N.J.S.A. 39:4–50.4a is a dischargeable debt. Alternatively, the debtor requests that if this court determines that the surcharge is nondischargeable, she be permitted to amend her Chapter 13 schedule to include the DMV as a creditor and thereby increase payments under her plan to the Chapter 13 Standing Trustee.

The facts of this case are not in dispute. On August 2, 1984, the debtor was convicted of refusal to submit to a chemical test (breathalizer) in violation of N.J.S.A. 39:4–50.4a.[1] Under the New Jersey Merit Rating Plan, N.J.S.A. 17:29A–35(b)(2), the DMV is required to levy annually for a three-year period Merit Rating Plan surcharges of not less than $1,000.00 per year, on all New Jersey licensees convicted of refusal to submit to a chemical test. Accordingly, on October 12, 1985 the DMV surcharged the debtor $1,000.00 for the surcharge period beginning in 1985. The DMV's records reveal that the debtor has paid 1985's surcharge in full.

On July 21, 1986, the debtor filed a voluntary Chapter 13 petition under the Bankruptcy Reform Act of 1978, as amended by the Bankruptcy Amendments and Federal Judgeship Act of 1984 (hereinafter "Code" or "Bankruptcy Code").

On October 12, 1986, the 1986 surcharge period began, obligating the debtor to another $1,000.00 surcharge based on her 1984 violation. Under the Merit Rating Plan the debtor is also subject to a plan surcharge of $1,000.00 in 1987. According to the Affidavit of Maurice Guadagno, Assistant Manager of DMV's Bureau of Insurance Surcharge and Collection filed on November 6, 1987, for the surcharge year 1987 the debtor was billed $175.00 due November 14, 1987. However, payments for the 1986 and 1987 surcharge periods have not been made.

The Chapter 13 Statement and Schedules filed by the debtor did not list the DMV as a creditor, nor did they refer to the surcharge. The debtor's Chapter 13 plan, filed with her petition, proposed to make a 20% payment to general unsecured creditors over a period of five years.

On October 8, 1986, a confirmation hearing was held regarding the debtor's proposed plan. The debtor's plan was confirmed by an order entered by this court on October 30, 1986 providing for payment to the Standing Trustee at a rate of $77.00 a month for thirty-six months, or three years. On December 15, 1986, the debtor filed a request to amend her Schedule A–2 to include the DMV as an unsecured creditor and list the $3,000.00 surcharge as an undisputed unsecured debt. The amendment was permitted by an order entered by this court on December 18, 1986.

On October 9, 1987, the DMV filed an answer to the debtor's complaint. The DMV asserted six affirmative defenses, which include:

(1) the complaint fails to set forth a cause of action upon which relief can be granted;

(2) this court lacks subject matter jurisdiction;

(3) the defendant (DMV) acted with good faith and without any fraud or malice;

(4) the Merit Rating Plan surcharges levied pursuant to N.J.S.A. 17:29A–35 are not debts and are therefore nondischargeable;

(5) the complaint fails to state the grounds upon which this court has jurisdiction pursuant to F.R.C.P. 8(a) and Bankruptcy Rule 7008(a); and

(6) in the event this court determines that the insurance surcharge is a debt, it is nondischargeable under 11 U.S.C. §§ 523(a)(7) and 523(a)(9).

On October 9, 1987, at the request of the debtor's attorney, the DMV put a "hold" on the proposed suspension of the debtor's New Jersey driving privileges for failure to pay the surcharge pursuant to N.J.S.A. 17:29A–35(b)(2), pending resolution of this adversary complaint.

On December 7, 1987, a hearing on the instant adversary proceeding was conducted by this court. Thereafter, additional

---

1. In connection with the same incident, the debtor was involved in an accident and was convicted of careless driving pursuant to N.J.S. A. 39:4–97.

briefs and affidavits were filed by the respective parties. On May 27, 1988, Hudson County Legal Services Corporation filed a motion to permit the filing by it of a brief as *amicus curiae.* On July 6, 1988, this court entered an order permitting Hudson County Legal Services Corporation to file an *amicus curiae* brief. Additionally, the DMV filed two affidavits in support of its position; the affidavit of J. Richard Boer, Chief of the Rating Bureau in the New Jersey Department of Insurance's Division of Actuarial Services—Property & Liability Insurance, filed January 14, 1988; and the affidavit of Patrick J. Hughes, Special Deputy Commissioner of the New Jersey Department of Insurance, filed February 4, 1988.

This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334(a) and § 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

The broad discharge granted to a Chapter 13 debtor who successfully completes a Chapter 13 plan is set forth in 11 U.S.C. § 1328(a), which states:

(a) As soon as practicable after completion by the debtor of all payments under the plan, unless the court approves a written waiver of discharge executed by the debtor after the order for relief under this Chapter, the court shall grant the debtor a discharge of all debts provided for by the plan or disallowed under section 502 of this title, except any debt—

(1) provided for under section 1322(b)(5) of this title; or

(2) of the kind specified in section 523(a)(5) of this title.

The only exceptions to discharge under § 1328(a) are for long-term debts and for alimony and child support. *In re Newton,* 15 B.R. 708, 709 (Bankr.W.D.Ga.1981). Thus, the contention by the DMV that the surcharge levied against the debtor to the extent it is determined to be a debt is nondischargeable under §§ 523(a)(7) and 523(a)(9) is simply without merit because these provisions do not apply to Chapter 13 cases. This principle, if not clear from a reading of the Code itself, is emphasized by case law, which states, generally that

... debts under § 523(a)(6) [another section of 11 U.S.C. § 523(a)] are not included in the list of debts which are not dischargeable under § 1328(a). The law is clear therefore that debts which fall within the scope of § 523(a)(6) may still be discharged pursuant to § 1328(a).

*In re DeSimone,* 25 B.R. 728, 729 (E.D.Pa. 1982), *cited in In re Johnson–Allen,* 69 B.R. 461, 464–65 (Bankr.E.D.Pa.1987).

Accordingly, if a surcharge imposed under N.J.S.A. 17:29A–35(b)(2) creates a debt cognizable under the Bankruptcy Code, that debt would be dischargeable under Chapter 13 of the Code in the same way debts which are not dischargeable under a Chapter 7 are dischargeable in a Chapter 13 case. *In re Newton, supra,* 15 B.R. at 709, *citing Matter of Lambert,* 10 B.R. 223 (Bankr.E.D.N.Y.1981). The threshold issue in the instant complaint is whether the surcharge is a "debt" cognizable under the Bankruptcy Code.

Section 101(11) of the Bankruptcy Code provides that the word "debt" means liability on a claim. "Claim" is defined in Section 101(4) of the Bankruptcy Code as:

(A) right to payment, whether or not such right is reduced to a judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

In enacting Section 101(4), Congress sought the "broadest possible definition of a claim," intending that virtually all obligations to pay money be amenable to treatment in bankruptcy proceedings. *See* H.Rep. No. 95–595, 95th Cong., 1st Sess. 309 (1977) 1978 U.S.Code Cong. & Ad.News 5787. The Third Circuit Court of Appeals dealt with the determination of when a claim arises in bankruptcy in the case of

*Matter of M. Frenville Co., Inc.*, 744 F.2d 332, 337 (3d Cir.1984), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985). In *Frenville,* the Third Circuit held that the threshold determination of whether a claim existed depended on if there was a "right to payment." *Frenville, supra,* 744 F.2d at 336. Recognizing that the Bankruptcy Code did not define "right to payment" the Third Circuit held that "while federal law controls which claims are cognizable under the Code, the threshold question of when a right to payment arises, absent overriding federal law, 'is to be determined by reference to state law.'" *Frenville, supra,* 744 F.2d at 337, *citing, Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 161, 67 S.Ct. 237, 239, 91 L.Ed. 162 (1946). The *Frenville* court did not find any overriding federal law in its case, and therefore applied state law to determine when the right to payment arose.

 Thus, whether or not the DMV has a right to payment is dependent upon state law. State law must be used to decide whether or not a claim exists. *Vanston Bondholders, supra,* 67 S.Ct. at 239. Once the existence of the claim is established, questions concerning whether the claim will be administered through the bankruptcy estate are determined by federal law. *Vanston Bondholders, supra,* 67 S.Ct. at 240.

A parallel may be drawn between the issue in this case and that faced by courts dealing with the dischargeability of criminal restitution orders. Although this court recognizes the differences between surcharges and criminal restitution, the analysis of the underlying state law is similar. Cases dealing with a determination of whether a criminal restitution order is a "debt" cognizable in bankruptcy have looked to the true purpose and intent behind the state law providing for the restitution. *See e.g., In re Button,* 8 B.R. 692 (Bankr.W.D.N.Y.1981); *In re Magnifico,* 21 B.R. 800 (Bankr.D.Ariz.1982). Accordingly, this court will analyze the purpose and intent behind the surcharge levied against the debtor herein.

The court in *Marks v. Snedeker,* 612 F.Supp. 1158 (D.N.J.1985) examined New Jersey automobile insurance laws as they existed prior to the enactment of the New Jersey Insurance Reform Act of 1982 and the New Jersey Automobile Full Insurance Availability Act, N.J.S.A. 17:29A–33 *et seq.* and N.J.S.A. 17:30E–1 *et seq.* ("Reform Act"), and thereafter. In *Marks v. Snedeker* the court stated:

Prior to January 1, 1983, the effective date of the Reform Act, an individual convicted of a drunken driving offense was subject to *criminal* penalties imposed by the State including fines, points on the license, license suspension or revocation, or imprisonment. *See e.g.* N.J. Stat.Ann. 39:4–50 *et seq.* (West Supp. 1984–85). In addition to these criminal penalties, a driver would almost inevitably be required, by his or her insurance carrier, to pay an insurance surcharge for a period of three years in order to compensate the insurer for the added risk posed by a driver with a history of drunken driving. Due to the complex nature of this previous statutory and regulatory scheme, insurance rates varied dramatically throughout the state dependent upon a driver's individual characteristics and the primary location of the automobile. *See* Affidavit of J. Richard Boer, Exhibit A. In addition to being subject to significant rate discrepancies, drivers throughout New Jersey were often unable to obtain insurance coverage, despite a good driving record, due to the perceived lack of profitability for insurance carriers in New Jersey and their resultant decisions to discontinue writing new policies. *See* "Karcher, Overview of no-fault auto insurance," New Jersey Lawyer, No. 111 May 1985 at 8.

In an attempt to remedy the deficiencies in the State's automobile insurance system, the legislature has enacted numerous statutory provisions which significantly overhaul the system and create a new and similarly complex scheme designed to provide insurance which "will be affordable, available, and more equitable to the motorists [throughout the] State ...". N.J.Stat.Ann. 17:29A–34(j)

(West 1985). A number of the reform provisions enacted are at issue here.

As a result of the Reform Act, individual insurance companies are no longer allowed to collect surcharges from motorists. Instead, a driver convicted of a drunken driving offense is billed directly by the State's Division of Motor Vehicles (DMV) which collects the surcharges and then disburses them to the New Jersey Automobile Full Insurance Underwriting Association (the Association) pursuant to N.J.Stat.Ann. 17:29A–35(b)(2) (West 1985). Underlying the removal of the surcharge system from the control of the individual insurance carriers is the need to eliminate the added insurance risk of drunken driving from rate calculations. This effort to standardize the insurance surcharge, resulting from drunken driving offenses statewide, is an integral component of the reform effort.

612 F.Supp. at 1159–1160. (Emphasis in text, footnote omitted).

The New Jersey Automobile Full Insurance Underwriting Association (hereinafter "Association") is an unincorporated, nonprofit association made up of all insurers licensed to transact automobile insurance in New Jersey. N.J.S.A. 17:30E–4. The Association runs an insurance pool in which drivers may obtain auto insurance if rejected elsewhere. *See* State of N.J. Senate Labor, Industry, and Professions Committee Statement to L.1986, c. 211, printed after N.J.S.A. 17:30E–3 (1987 Supplement). The Association is not a state agency and may sue or be sued in its own name. N.J.S.A. 17:30E–4 and 17:30E–7.

Besides insurance premiums, the Association obtains revenue from several types of insurance surcharges, including: accident surcharges which the insurer bills to policyholders and keeps, N.J.S.A. 17:29A–35(a); "residual market equalization charges" which the Insurance Commissioner imposes on all auto insurance policyholders, N.J.S.A. 17:30E–8; and surcharges which are imposed on motorists who commit any traffic offense which results in "points" against their driver's license, N.J.S.A. 17:29A–35(b)(1)(A), or who are convicted of driving while intoxicated or refusal to submit to a breathalizer, N.J.S.A. 17:29A–35(b)(2), as the debtor herein.

The surcharge imposed upon the debtor in this case is provided for under N.J.S.A. 17:29A–35(b)(2), the New Jersey Merit Rating Plan, which stated, in pertinent part at the time of debtor's 1984 violation:[2]

(2) Plan surcharges shall be levied for convictions under R.S. 39:4–50 or section 2 of P.L.1981, c. 512 (C. 39:4–50.4a), or for offenses of a substantially similar nature committed in other jurisdictions, for violations occurring on or after January 1, 1983. Surcharges under this paragraph shall be levied annually for a three year period, and shall be not less than $1,000.00 per year for each of the first two convictions, and not less than $1,500.00 per year for the third conviction occurring within a three year period. If a driver is convicted under both R.S. 39:4–50 and section 2 of P.L.1981, c. 512 (C. 39:4–50.4a) for offenses arising out of the same incident, the driver shall be assessed only one surcharge for the two offenses. The commissioner may increase the amount of surcharges as he deems necessary to effectuate the purposes of subsection d. of this section and P.L.1983, c. 65 (C. 17:29A–33 et al.), and may, pursuant to regulation, permit the deferral of all or any part of these surcharges as provided in paragraph (1)(a) of this subsection.

If, upon written notification from the Division of Motor Vehicles, mailed to the last address of record with the division a driver fails to pay a surcharge levied under this subsection, the license of the driver shall be suspended forthwith until the surcharge is paid to the Division of Motor Vehicles; except that upon satisfactory showing of indigency, the Division of Motor Vehicles may authorize payment of the surcharge on an install-

**2.** N.J.S.A. 17:29A–35 was amended by L.1985, c. 520 § 1, effective January 21, 1986, and L.1986, c. 211 § 8, effective January 12, 1987.

ment basis over a period not to exceed six months.[3]

All moneys collectible under this subsection shall be billed and collected by the Division of Motor Vehicles. Of the moneys collected, 80% shall be remitted to the New Jersey Automobile Full Insurance Underwriting Association, and 20% shall be retained, for administrative expenses, by the Division of Motor Vehicles and turned over to the State Treasury for deposit in a special account to be used by the Division of Motor Vehicles, as may be necessary, to modernize its operations and improve its effectiveness and efficiency in order to discharge its statutory obligations. Any moneys in the special account at the end of a fiscal year shall be transferred to the General Fund for use for general State purposes. Moneys shall be appropriated annually to the special account.

N.J.S.A. 17:29A–35(d) further provides:

d. The dollar amount of all motor vehicle conviction surcharges shall be at least equivalent to the differential between the rates charged to insureds as promulgated by the rating bureau which files rates for the greatest number of insurers in the voluntary private passenger automobile insurance market in this State and the supplement I rates in use as of December 31, 1982 by the automobile insurance plan established pursuant to P.L.1970, c. 215 (C. 17:29D–1), and the amount collectible under the motor vehicle conviction surcharge system in use by the automobile insurance plan established pursuant to P.L.1970, c. 215 (C. 17:29D–1 et seq.) prior to the implementation of this act; except that in the first year of operation of the New Jersey Automobile Full Insurance Underwriting Association, the dollar amount of all motor vehicle surcharges shall be sufficient to eliminate the need for imposition of a residual market equalization charge authorized under section 20 of P.L.1983, c. 65 (C. 17:30E–8).

Surcharge funds collected by the DMV are infused directly into the insurance system via the Association. In the affidavit submitted by the DMV in support of its position, Patrick J. Hughes, Special Deputy Commissioner with the New Jersey Department of Insurance stated:

The surcharge revenue, together with other insurance premiums paid to the Association, are utilized to offset the costs of operating the Association, including the costs of paying future claims. Plan surcharges are not collected as reimbursement for specific insurance claims previously paid on behalf of the surcharged driver. They constitute additional premium revenue necessary to fund payment of Association claim obligations as they arise.

Plan surcharges were designed by the State Legislature to eliminate the inequitable application of motor vehicle violation surcharges under traditional insurance industry classification-based surcharge systems. Under the Plan, the amount of the "bad driver" surcharges is set by the State, rather than by private insurers. Plan surcharges are made a direct function of the additional risk which a driver poses, as demonstrated by his or her actual driving history, rather than upon the demographic characteristics (age, marital status, etc.) already accounted for in the premium calculation. They are uniform for all drivers convicted of similar offenses and do not vary based on rating classification or territory. Moreover, because failure to pay Plan surcharges will result in license suspension, high risk drivers who might have escaped a surcharge in the past by operating vehicles covered by policies issued in the name of another insured party are no longer permitted to continue to operate vehicles on the highways of this State. Only where they have made a fair contribution to the auto insurance system to compensate for the additional loss exposure they represent will they be permitted to obtain a driver's license. The

---

**3.** The 1985 amendment allowed installment payments of the surcharge to be made over a ten month rather than six month period.

surcharges promote equity by shifting to all those who have manifested a disregard for the laws promoting highway safety the burden of bearing a portion of the cost of the additional risk they pose to the automobile reparation system.

In order to operate a motor vehicle lawfully on the highways of this State, drivers must maintain both a valid drivers license and proof of financial responsibility in the form of automobile liability insurance. N.J.S.A. 39:3–10, N.J.S.A. 39:6B–1 *et seq.* The financial responsibility provided by a policy of insurance is underwritten by the premiums paid for that policy. These premiums are the funding source that support the comprehensive automobile reparation insurance system. If premiums are not paid, the policy will be cancelled and the driver will be unable to demonstrate compliance with the States' motor vehicle responsibility laws. Similarly, Plan surcharges represent charges assessed to the driver based on actual driving behavior and, just as the policy premium, are utilized to fund the automobile reparation insurance system. They are, therefore, an essential prerequisite for a surchargeable driver to establish financial responsibility to operate a vehicle in this State. Failure to pay the surcharges established by law constitutes a failure to comply with the motor vehicle financial responsibility laws of New Jersey and thereby subjects the driver to license suspension.

(*See* Affidavit of Patrick J. Hughes, filed February 4, 1988 at pp. 3–5).

In *Clark v. New Jersey Division of Motor Vehicles*, 211 N.J.Super. 708, 512 A.2d 588 (App.Div.1986), the Appellate Division affirmed an administrative law judge's determination that a motorist was subject to the surcharge under the Merit Rating Plan. The court determined that the surcharge did not violate the constitutional prohibition against *ex post facto* laws, stating:

> This prohibition applies only when the legislation is retrospective in operation. *Weaver v. Graham*, 450 U.S. 24, 29, 101 S.Ct. 960, 964, 67 L.Ed.2d 17, 23 (1981). The Merit Rating Plan surcharge was approved prior to petitioner's arrest for

violating N.J.S.A. 39:4–50. While calculation of penalties under the Plan applies to offenses based upon consideration of a licensee's driving history, the Plan only relates to the future operation of a motor vehicle. The Merit Rating Plan merely gives the Division of Motor Vehicles the responsibility of assessing surcharges for high risk drivers in a uniform manner, as opposed to the area-based industry surcharge previously in existence. The law establishes an industry surcharge system based upon an individual's driving history and sets qualifications for the offender's continued driving on the highway.

Petitioner's claim that the statute is punitive in nature also must fail. The prohibition against *ex post facto* law only applies to punitive legislation. *Galvan v. Press*, 347 U.S. 522, 531, 74 S.Ct. 737, 742–743, 98 L.Ed. 911, 922 (1954). *It does not apply to retrospective legislation involving a statutory system of civil penalties. Harisiades v. Shaughnessy*, 342 U.S. 580, 594–595, 72 S.Ct. 512, 521, 96 L.Ed. 586, 601 (1952).

The label on a law does not make it civil or nonpunitive. The *ex post facto* prohibition cannot be avoided by merely calling a statute civil when in effect it is criminal. *Burgess v. Salmon*, 97 U.S. (7 Otto) 381, 403, 24 L.Ed. 1104, 1106 (1878). Here the purpose and effect of the Merit Rating Plan surcharges are clearly remedial and civil. Historically, motor vehicle violations, including N.J.S. A. 39:4–50 and N.J.S.A. 39:4–50.41, have not been considered crimes but traffic offenses. *See State v. Cusik*, 110 N.J.Super. 149, 151 [, 264 A.2d 735, 736] (App.Div.1970); *State v. McCarthy*, 30 N.J.Super. 6, 8 [, 103 A.2d 169, 170] (App.Div.1954). The statute does not deprive a person of any status, opportunity or privilege. Instead, the person must pay a monetary assessment in accordance with a uniform schedule for the privilege of driving on the highways. All persons in the class pay in accordance with the fixed charges for violations they have accumulated. The plan is no more or less "punitive" in

nature than the State requirements of compulsory insurance. In view of the carnage caused by persons driving while intoxicated, the surcharges can hardly be said to be excessive. We conclude N.J.S. A. 17:29A–35(b) is not punitive in nature and not proscribed under the *ex post facto* provision of the State or federal constitutions.

*Clark v. New Jersey Division of Motor Vehicles, supra,* 211 N.J.Super. at 710–11, 512 A.2d at 589. (Emphasis added).

The Honorable William H. Gindin of this court analyzed the Merit Rating Plan in the context of a chapter 7 case in *In re Graham,* 85 B.R. 713 (Bankr.D.N.J.1988). In *Graham* the debtor was convicted of operating a motor vehicle while under the influence of alcohol in violation of N.J.S.A. 39:4–50. Subsequently, the debtor and his wife filed a Chapter 7 petition. The debtors listed a $2,000.00 Merit Rating Plan debt on their bankruptcy schedule. The DMV thereafter brought an action to determine the dischargeability of the surcharge under 11 U.S.C. § 727. The court characterized the surcharge as "simply an additional premium payable for the necessary insurance," and further stated that "[o]ne could liken this to the payment of a premium to an insurance agent who retains his commission and remits the balance of the premium to the insurer." *In re Graham, supra,* 85 B.R. at 716 and n. 1.

The *Graham* court further relied on the use of prior experience to establish future insurance premiums in holding that there was no pre-petition "right to payment" and therefore the surcharge was not a debt dischargeable under 11 U.S.C. § 727:

> The concept of using prior experience in order to establish future premiums is one which has been accepted by this court. In *In re Primrose Bedspread Corp.,* 67 B.R. 659 (Bankr.D.N.J.1986) it was held that the uniform application of past experience was an appropriate measure of future premiums. "[E]xperience ... [may be used] ... in calculating the experience rating of the debtors and the subsequent premiums owed ...". *In re A.C. Williams Co.,* 51 B.R. 496, 497

(Bankr.N.D.Ohio 1985). An additional premium based upon the specific statistics of drivers who are guilty of driving while intoxicated, or who failed to take a breathalyzer test, or who have accumulated a large number of points, is no different than adjusting premiums based upon the age of the driver or the geographic location of the motor vehicle. Such distinctions historically have been considered appropriate in the assessment of insurance premiums and the establishment of appropriate rates. N.J.S.A. 17:29A–4. *See also, Coro Brokerage, Inc. v. Rickard,* 29 N.J. 295, 148 A.2d 817 (1959).

> Thus, since there is no pre-petition "right to payment" no matter how incomplete same may be, there can be no debt dischargeable under 11 U.S.C. § 727.

. . . . .

> Since the entire surcharge in the instant case was prospective and intended to go into effect subsequent to the filing of the petition, the claimed charge is not dischargeable.

*In re Graham, supra,* 85 B.R. at 716–17.

The *Graham* court characterized the three-year surcharge in that case as prospective in nature and not a pre-petition right to payment since it would only become effective post-petition. 85 B.R. at 716–17.

The court finds in this case that the debtor has a pre-petition obligation to pay a three-year surcharge of $3,000.00, allocated at $1,000.00 per year. In fact, the debtor paid the 1985 portion of the surcharge in full. To argue that the remaining $2,000.00 of the obligation is post-petition in nature merely because a bill is not generated by the DMV and sent to the motorist pre-petition is unpersuasive. The obligation to pay the three-year surcharge arose out of the debtor's conviction for failure to submit to a breathalyzer test pursuant to N.J.S.A. 39:4–50.4a. This conviction was entered on August 2, 1984, almost two years before the filing of the debtor's petition. The three-year surcharge is levied at the time of the conviction, albeit it is a $3,000.00 obligation which is paid in three

equal, yearly installments. It is this court's opinion that the surcharge is an obligation which arose at the time the debtor was convicted of violating N.J.S.A. 39:4–50.4a, August 2, 1984, which was prior to the filing of the debtor's petition. Accordingly, the DMV's right to payment arose pre-petition and the surcharge is thus a pre-petition debt dischargeable under § 1328(a). The fact that the DMV's right to payment is enforceable by suspension of the driver's license rather than by a money judgment in favor of the DMV is not sufficient in this Court's view to render the obligation of the debtor not a debt pursuant to 11 U.S.C. § 101(11).

This outcome complies with the Third Circuit decision in *Matter of Frenville, supra,* 744 F.2d 332. In *Frenville,* the court, applying state law, held that a claim for contribution or indemnification did not accrue at the time of the commission of the act, which was pre-petition, but rather at the time of payment of the judgment flowing from the act, which was post-petition. *Matter of Frenville, supra,* 744 F.2d at 337. Accordingly, the claim was held to arise post-petition and the automatic stay of § 362 was deemed not applicable to an action to collect on the indemnification claim. *Id.*

■ In the instant case, the DMV's right to payment accrued when the debtor was convicted of violating an offense covered by the Merit Rating Plan. The fact that this right to payment was deferred over a three-year period is of no consequence in determining the accrual of a debt or claim cognizable in bankruptcy. Such a situation is commonplace in bankruptcy. A variety of debts including mortgages, and contract obligations, accrue pre-petition and provide for payment over several years which may extend post-petition. Simply because a bill is not presented to the debtor until after the filing of a bankruptcy petition does not change the character of the debt obligation.

Furthermore, the broad definition of "claim" supports the inclusion of the surcharge within the debts subject to a Chapter 13 discharge. The DMV's "claim" in the debtor's case arose when she was convicted in state court. The "debt", or liability on that claim, existed at that time and, like most debts, was entitled to thrive in the bankruptcy context. A narrow reading of "claim" and "debt" in the bankruptcy context is obviously contrary to legislative intent. Categorizing a debt as post-petition in nature merely because it is billed post-petition is contrary to the legislative intent. The notions of "claim" and "debt" as defined in the Bankruptcy Code have an extremely broad, virtually limitless meaning. *Ohio v. Kovacs,* 469 U.S. 274, 105 S.Ct. 705, 709, 83 L.Ed.2d 649 (1985).

Hudson County Legal Services, in its brief filed with this court, argues that enforcement of the New Jersey Merit Rating Plan by the DMV against the debtor conflicts with the discharge provisions and fresh start policies of the Bankruptcy Code and as applied to the debtor herein violates 11 U.S.C. § 525(a).

The United States Supreme Court addressed the issue of a conflict between the former Bankruptcy Act and state legislation in the case of *Perez v. Campbell,* 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971). The state legislation in question in *Perez* was a section of Arizona's Motor Vehicle Safety Responsibility Act, which provided for the suspension of the license of a driver involved in a motor vehicle accident, and the suspension of the registration of the accident vehicle, until security, sufficient to satisfy any judgment which might be obtained for damages resulting from the accident was deposited. Another provision of the Motor Vehicle Safety Responsibility Act provided that a discharge in bankruptcy would not relieve the debtor from any requirements of the Act. Furthermore, pursuant to Arizona law, once an individual's license and registration had been suspended, they remained suspended and no other license or registration could be issued in the same name, until the individual, in addition to satisfying the judgment debt, gave proof of future financial responsibility.

The *Perez* court set forth a two step test for determining whether a state statute and a federal statute are in conflict so as to

render the state statute invalid under the Supremacy Clause. Pursuant to the test, the statutes at issue must first be construed, and next the statutes must be compared to determine whether a conflict exists. Applying this test to the facts before it, the *Perez* court determined that the purpose of the state automobile regulations was to protect the public from financial hardship which could result from the negligence of financially irresponsible automobile operators. With regard to the Bankruptcy Act, the *Perez* court established that its purpose was to provide debtors with " 'a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt.' " 402 U.S. at 648, 91 S.Ct. at 1710 (quoting *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934)).

In applying the second step of the two-prong test, the *Perez* court maintained that its function was to determine whether the state statute " 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " 402 U.S. at 649, 91 S.Ct. at 1711 (quoting *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)). Ultimately, the court concluded that the statutes were in conflict, and that thus, the automobile regulations were constitutionally invalid. 402 U.S. at 656, 91 S.Ct. at 1714.

Section 525 of the Bankruptcy Code codifies the Supreme Court's decision in *Perez v. Campbell.* Title 11 U.S.C. § 525(a) provides in relevant part:

a governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title or a bankrupt or a debtor under the Bankruptcy Act, or another person with whom such bankrupt or debtor has been associated, solely because such bankrupt or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, has been insolvent before the commencement of the case under this title, or during the case but before the debtor is granted or denied a discharge, or has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act.

The legislative history of 11 U.S.C. § 525 indicates that the list of forms of discrimination contained in 11 U.S.C. § 525 is not intended to be limiting:

The enumeration of various forms of discrimination against former bankrupts is not intended to permit other forms of discrimination. The courts have been developing the Perez rule. This section permits further development to prohibit actions by governmental or quasi-governmental organizations that perform licensing functions ... or by other organizations that can seriously affect the debtor's livelihood or fresh start ... The effect of the section, and of further interpretations of the Perez rule, is to strengthen the anti-reaffirmation policy found in § 524(b). Discrimination based solely on nonpayment could encourage reaffirmations, contrary to the expressed policy.

S.Rep. No. 989, 95th Cong., 2d Sess., *reprinted in* 1978 U.S.Code Cong. & Ad. News 5787, 5867.

"Governmental unit" is defined by the Bankruptcy Code as follows:

'governmental unit' means United States; State; Commonwealth; District; Territory, municipality; foreign state; department, agency, or instrumentality of the United States, a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government.

11 U.S.C. § 101(24). The DMV is clearly within the scope of this statutory definition.

In the instant case, the DMV argues that in this case the debtor, a licensed driver who has been convicted of refusal to submit to a chemical test, pursuant to N.J.S.A.

39:4–50.4a, seeks to avoid payment of the surcharge imposed by the Merit Rating Plan while continuing to drive in the State of New Jersey and thereby retain to herself the benefits of the Reform Act which provide an insurance policy at voluntary market rates and freedom from any carrier imposed surcharges.

In *Duffey v. Dollison,* 734 F.2d 265 (6th Cir.1984), the debtors alleged that enforcement of Ohio's Motor Vehicle Financial Responsibility Act as to them was discriminatory and thus violative of 11 U.S.C. § 525. The financial responsibility law required the suspension of driver licenses and registrations of individuals who failed to pay judgments arising out of automobile accidents within thirty days of a written request by the judgment creditor or by the judgment creditor's attorney. Pursuant to the financial responsibility law, driving privileges were to remain suspended for seven years, or until the judgment was stayed or satisfied and proof of financial responsibility was submitted. 734 F.2d at 269. It is noteworthy that a previous version of the financial responsibility statute had been deemed unconstitutional to the extent that it required the payment of a tort judgment entered as a result of an automobile accident as a prerequisite to the restoration of driving privileges. This payment requirement had applied regardless of whether the judgment had been stayed or discharged in bankruptcy. 734 F.2d at 269.

The *Duffey v. Dollison* court held that the new financial responsibility statute, which required individuals who failed to pay judgments arising out of automobile accidents to post proof of financial responsibility as a prerequisite to restoration of their driving privileges, was not preempted by federal bankruptcy law. In reaching its decision, the court distinguished the statutory provision at issue therein from the one at issue in *Perez v. Campbell.* The *Duffey v. Dollison* court stated that in order to regain privileges, the statute in *Perez v. Campbell* required payment of a judgment, even if its collection was stayed or it was discharged in bankruptcy, while the statute in *Duffey v. Dollison* merely required

proof of future financial responsibility. 734 F.2d at 272.

The court in *In re A.C. Williams Co.,* 51 B.R. 496 (Bankr.N.D.Ohio 1985) commented upon the Sixth Circuit's decision in *Duffey v. Dollison, supra,* as follows:

> The Sixth Circuit in *Duffey* noted that the legislative history to section 525 indicates that the section was intended to assure the debtor a "fresh start" by preventing governmental discrimination based "solely" on the bankruptcy of the debtor and to strengthen the anti-reaffirmation policy of section 524(b). *Duffey,* 734 F.2d at 271. " '[T]he primary purpose of section 525 of the Bankruptcy Code is to prevent the government either from denying privileges to individuals solely as a reaction to their filing bankruptcy or from conditioning the grant of privileges on the bankrupt's reaffirmation of certain debts.' " *Id.* (quoting *Duffey v. Dollison,* No. C–2–81–1154, slip op. at 8 (S.D.Ohio Aug. 13, 1982)). Legislative history indicates that section 525 is not a prohibition of all factors, such as future financial responsibility or condition, and net capital rules, but it only prohibits the *discriminatory* examination of certain factors, e.g. the fact of bankruptcy or the discharge of a debt in bankruptcy. 734 F.2d at 271.

51 B.R. at 500.

In the case at bar, N.J.S.A. 17:29A–35(b)(2), the statute presently in issue, unlike the statute at issue in *Duffey v. Dollison,* requires that the debtor pay pre-petition debts which are in the nature of civil penalties in order to maintain her driving privileges. Nor is the statute one dealing with compulsory insurance. The application of N.J.S.A. 17:29A–35(b)(2) to the instant debtor resulting in suspension of the debtor's driver's license as a result of unpaid pre-petition surcharges does not represent a valid financial responsibility rule. *Accord, Miller v. Anckaitis,* 436 F.2d 115 (3d Cir.1970), *cert. denied,* 403 U.S. 910, 91 S.Ct. 2203, 29 L.Ed.2d 688 (1971) (holding that the Pennsylvania Motor Vehicle Safety Responsibility Provisions, Pa.Stat.Ann. Tit. 75 § 1414 (1960), when as applied to a

debtor provided for suspension of the debtor's license and driver registration where a tort judgment remained unsatisfied, notwithstanding a discharge in bankruptcy, and where the judgment debt had been held vicariously liable for omission of a subagent, was unconstitutional as in conflict with § 17 of the Bankruptcy Act).

█ The debtor in this case to comply with the provisions of the New Jersey Merit Rating Plan will have to pay pre-petition debts in derogation of the priorities established by the Bankruptcy Code to retain her driving privileges. There exists an inherent conflict between the effect and enforcement of the New Jersey Merit Rating Plan on the debtor and the goals and policies of the bankruptcy laws. The debtor cannot be compelled to satisfy the unpaid pre-petition surcharges, except to the extent such payment is consistent with the debtor's Chapter 13 plan, which provides in this case for twenty-percent payment to unsecured creditors under the debtor's Chapter 13 plan.

Here the court notes that N.J.S.A. 17:29A–35(b)(2) as amended in 1985 provides that upon a showing of indigency the surcharges may be paid on an installment basis not to exceed ten months. The debtor proposes to pay 20% of the undisputed surcharge along with other unsecured debts over the plan term of three years.[4] Here there is an inherent conflict between N.J.S.A. 17:29A–35(b)(2) which provides, upon a showing of indigency, payment of plan surcharges over ten months, and the ability of a Chapter 13 debtor under Section 1322(c) to make payments under a plan for a period from three to five years. Under the rule of *Perez v. Campbell*, the provisions of Section 1322(c) must control.

█ Accordingly, this court holds that the New Jersey Merit Rating Plan surcharges are "debts" cognizable in bankruptcy and dischargeable under the discharge granted under § 1328(a), after the debtor has completed payments under her Chapter 13 plan. The court further holds that enforcement of the New Jersey Merit Rating Plan against the debtor to the extent that N.J.S.A. 17:29A–35(b)(2) provides that the debtor's driver's license shall be suspended until the surcharge is paid violates 11 U.S.C. § 525. It is clear that a Chapter 13 debtor is protected from collection efforts by the DMV during the interim between the filing of the Chapter 13 petition and the entry of discharge by the automatic stay of 11 U.S.C. § 362. *In re Gilliam*, 67 B.R. 83, 86 (Bankr.M.D.Tenn. 1986).

Under 11 U.S.C. § 362, the filing of a bankruptcy petition operates as a stay with regard to actions against a debtor including:

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

(2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

(4) any act to create, perfect, or enforce any lien against property of the estate;

(5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;

---

**4.** This may necessitate an amendment to the debtor's confirmed Chapter 13 plan which should be accomplished by separate proceedings. In this regard the court notes that the DMV asserts that it was never served with copies of the debtor's petition, Chapter 13 plan or amended statement. (*See* Affidavit of Maurice Guadagno at paragraph 5). To the extent that the DMV would seek relief from the order of confirmation issued herein that must also be brought by separate proceedings.

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;

(7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; and

(8) the commencement or continuation of a proceeding before the United States Tax Court concerning the debtor.

11 U.S.C. § 362(a).

The scope of the automatic stay provision of 11 U.S.C. § 362 is broad and encompasses all proceedings, even those not before governmental tribunals. H.R. No. 595, 95th Cong., 2d Sess. (1977), *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 6297. Title 11 U.S.C. § 362 freezes the rights of creditors as of the date of the filing of a petition under the Bankruptcy Code in order to protect against the piecemeal distribution of the bankruptcy estate. The automatic stay also operates to ensure that claims against a debtor's estate are resolved in an orderly fashion in accordance with the priorities scheme of the Bankruptcy Code, and to prevent a " 'chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts.' " *In re Holtkamp*, 669 F.2d 505, 508 (7th Cir.1982) (quoting *In re Frigitemp Corp.*, 8 B.R. 284, 289 (S.D.N.Y 1981)).

Section 362(b)(4) and (5) provide:

(b) The filing of a petition ... does not operate as a stay—

(4) under subsection (a)(1) of this section, of the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power;

(5) under subsection (a)(2) of this section, of the enforcement of a judg-ment, other than a money judgment, obtained in an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power.

The legislative history of this section is instructive as to its purpose:

Paragraph (4) excepts commencement or continuation of actions and proceedings by governmental units to enforce police or regulatory powers. Thus, where a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws, or attempting to fix damages for violation of such a law, the action or proceeding is not stayed under the automatic stay. Paragraph (5) makes clear that the exception extends to permit an injunction and enforcement of an injunction, and to permit the entry of a money judgment, but does not extend to permit enforcement of a money judgment. Since the assets of the debtor are in the possession and control of the bankruptcy court, and since they constitute a fund out of which all creditors are entitled to share, enforcement by a governmental unit of a money judgment would give it preferential treatment to the detriment of all other creditors.

H.R. No. 595, 95th Cong., 2d Sess. (1977), *reprinted in* 1978 U.S.Cong. & Ad.News, 5787, 6299.

This court recognizes that the regulation of the business of insurance is clearly a proper and traditional subject for the state's exercise of its police power. *See Country–Wide Insurance Co. v. Harnett*, 426 F.Supp. 1030, 1034 (D.N.Y.1977), *aff'd*, 431 U.S. 934, 97 S.Ct. 2644, 53 L.Ed.2d 252; *State v. McCourt*, 131 N.J.Super. 283, 286, 329 A.2d 577, 578 (App.Div.1974); the McCarran–Ferguson Act, 15 U.S.C. § 1011 *et seq.*[5], 15 U.S.C. § 1012(b). In this re-

---

**5.** The McCarran–Ferguson Act provides in relevant part:

Congress declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business on the several States.

15 U.S.C. § 1011.

(a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

spect the United States Supreme Court has established that states may constitutionally require all motorists to carry liability insurance or post security before they are issued driver's licenses. *See Bell v. Burson*, 402 U.S. 535, 539, 91 S.Ct. 1586, 1589, 29 L.Ed. 2d 90 (1971). *See also Duffey v. Dollison*, 734 F.2d 265 (6th Cir.1984).

The Third Circuit, in the case of *Penn Terra Limited v. Department of Environmental Resources, Commonwealth of Pennsylvania*, 733 F.2d 267 (3d Cir.1984) (*Penn Terra*), was called upon to determine whether a conflict existed between the United States Bankruptcy Code and state environmental laws promulgated by the Commonwealth of Pennsylvania. In *Penn Terra*, the Commonwealth of Pennsylvania was attempting to force a company, which had filed a petition for relief under the Bankruptcy Code, to correct violations of state environmental laws. Correction of the violations, however, would deplete the assets of the corporation, which assets otherwise would be used to repay the debts of general creditors.

In determining whether the automatic stay provisions of 11 U.S.C. § 362 operated to preclude the state from enforcing its environmental laws, the *Penn Terra* court examined the underlying policies of the Bankruptcy Code and of the subject environmental laws. The court also considered the general policies regarding pre-emption. The court noted that protection and preservation of a debtor's assets, so that the funds of a bankruptcy estate may be equitably distributed amongst creditors without unfair preference, is central to the statutory scheme of the Bankruptcy Code. 733 F.2d at 269 and 278. The court further noted the important purposes of the state's environmental laws, which are, the protection and preservation of the state's natural resources and the correction of damage to the environment by those who cause harm thereto. *Id.* at 269. Finally, the court acknowledged that respect must be given to the independent sovereignty of the

states, and that federal supremacy must not be lightly invoked. *Id.* at 273.

The *Penn Terra* court established that the enforcement of Pennsylvania's environmental laws was clearly an exercise of the state's police and regulatory power as provided in 11 U.S.C. § 362(b)(4). However, the *Penn Terra* court determined that the injunction ordering the debtor to rectify harmful environmental hazards was not the enforcement of a money judgment, and thus was not encompassed by the automatic stay provision of 11 U.S.C. § 362(a). 733 F.2d at 278–279. In dicta, the *Penn Terra* court noted that, "in some individual situations, the exercise of State power, even for the protection of the public health and safety, may run so contrary to the policy of the Bankruptcy Code that it should not be permitted." 733 F.2d at 273.

The *Penn Terra* court indicated that even where state action is excepted from the automatic stay pursuant to 11 U.S.C. § 362(b)(4), the bankruptcy court may, in its discretion, issue an injunction under 11 U.S.C. § 105. The court noted that Congress explicitly considered 11 U.S.C. § 105 when it excepted government regulation from the automatic stay. Accordingly, the *Penn Terra* court quoted Senate Report Number 95–989:

> Subsection (b) lists seven exceptions to the automatic stay. The effect of an exception is not to make the action immune from injunction.
>
> The court has ample other powers to stay actions not covered by the automatic stay. Section 105, of the proposed title 11, derived from the Bankruptcy Act 2a(15), grants the power to issue orders necessary or appropriate to carry out the provisions of title 11. The district court and the bankruptcy court as its adjunct have all the traditional injunctive powers of a court of equity [statutory citations omitted]. Stays or injunctions issued under these other sections will not be automatic upon commencement of the case,

---

(b) No Act of Congress shall be construed to invalidate, impair, or supercede any law enacted by any State for the purpose of regulating the business of insurance,....unless

such Act specifically relates to the business of insurance....

15 U.S.C. § 1012(a) and (b).

but will be granted or issued under the usual rules for the issuance of injunctions. By excepting an act or action from the automatic stay, the bill simply requires that the trustee move the court into action, rather than requiring the stayed party to request relief from the stay. There are some actions, enumerated in the exceptions, that generally should not be stayed automatically upon commencement of the case, for reasons of either policy or practicality. Thus, the court will have to determine whether a particular action which may be harming the estate should be stayed.

733 F.2d at 273 (quoting S.Rep. No. 95–989 at 51, 1978 U.S.Code Cong. & Ad.News at 5787, 5837; H.Rep. No. 95–595 at 342, 1978 U.S.Code Cong. & Ad.News at 5963, 6298).

The United States Supreme Court, in the case of *Ohio v. Kovacs*, 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985), commented that the action excepted from the automatic stay in the *Penn Terra* case was, "an effort to enforce the police power statutes of the State, not a suit to enforce a money judgment." *Ohio v. Kovacs*, 105 S.Ct. at 711 n. 11. In discussing the *Penn Terra* decision, the Supreme Court in *Ohio v. Kovacs* explicitly stated, "[t]he automatic stay provision does not apply to suits to enforce the regulatory statutes of the State, but the enforcement of such a judgment by seeking money from the bankrupt ... is another matter." 105 S.Ct. at 711 n. 11.

In *Ohio v. Kovacs*, the Supreme Court analyzed the obligation of a debtor to comply with an injunction which had been issued prior to the commencement of the bankruptcy proceeding. The injunction, obtained by the State of Ohio, required the debtor to clean up a hazardous waste disposal site. The Supreme Court held that this obligation constituted a "debt" or "liability on a claim" which was subject to discharge under the Bankruptcy Code. Justice O'Connor authored a concurring opinion in the case of *Ohio v. Kovacs*, wherein it was noted that the State of Ohio could protect its interest in the enforcement of its environmental laws by giving clean-up judgments the status of statutory liens or secured claims. 105 S.Ct. at 712.

In the case of *Midlantic National Bank v. New Jersey Department of Environmental Protection*, 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986), *reh'g. denied*, 475 U.S. 1090, 106 S.Ct. 1482, 89 L.Ed.2d 736 (1986) (*Midlantic*), the Supreme Court held that a bankruptcy trustee could not abandon property under 11 U.S.C. § 544(a) in contravention of state statutes or regulations designed to protect the public health or safety from identified hazards. In *Midlantic*, the Supreme Court stated:

'Thus, where a governmental unit is suing a debtor to prevent or stop violation of fraud, *environmental protection*, consumer protection, *safety, or similar police or regulatory laws*, or attempting to fix damages for violation of such a law, the action or proceeding is not stayed under the automatic stay.'

106 S.Ct. at 761 (quoting H.R.Rep. No. 95–595, p. 343 (1977), U.S.Code Cong. & Ad.News 6299). The Supreme Court, however, also noted that the exception to the automatic stay contained in 11 U.S.C. § 362(b)(5) permits the government to enforce " 'nonmonetary' judgments against a debtor's estate." 106 S.Ct. at 761.

The statute at issue in this case is neither a statute dealing with compulsory insurance nor a valid financial responsibility law, both of which would not be affected by the automatic stay. Instead the New Jersey Merit Rating Plan involves a statutory system of civil penalties, the collection of which by the DMV must abide the provisions of § 362.

The debtor's complaint before the court does not seek injunctive relief. The Court at this time will refrain from issuing any injunction against the DMV. As set forth by the Third Circuit in *Matter of Davis*, 691 F.2d 176, 178 (3d Cir.1982) "[w]e decline to presume" that the DMV "will disregard the obligation imposed upon them by the federal Constitution" to heed the orders of this court. *See Davis, supra*, 691 F.2d at 178. This court shall only act if of the parties do not heed this directive as to their obligations in light of this opinion.

An appropriate order shall be submitted in accordance with this opinion.